## THE STATE v. GEORGE SMITH, Appellant.

Division Two, March 7, 1911.

1. INFORMATION: Negativing Exception of Class. Where the act concerning the practice of medicine and surgery in one section says, "It is not intended by this act to prohibit gratuitous service to and treatment of the afflicted," it is not necessary to negative such exception in the information. Treating the sick gratuitously is not a part of the description of the offense of practicing medicine or surgery without a license from the State Board of Health.

2. CONSTITUTIONAL LAW: Medical Act of 1901: Title: Caption: One Subject. The caption of the act is not its title. A title which is, "An Act to regulate the practice of medicine, sur-

gery and midwifery, and to prohibit treating the sick and afflicted without a license, and to provide penalties for the violation thereof," clearly expresses that the one subject of the act is the public health, and that being the sole subject of the act, the act is valid. The treatment of the sick and the practice of medicine and surgery are in natural relation, and are but one subject.

3. **EJUSDEM GENERIS: Attempting to Treat the Sick: Limited to Treatment by Medicine.** The general words of the statute, "Any person attempting to treat the sick or other persons afflicted with bodily or mental infirmities," found in the clause, "Any person practicing medicine or surgery in this State, and any person attempting to treat the sick or others afflicted with bodily or mental infirmities, without first obtaining a license from the State Board of Health," etc., are not, by the application of the rule of *ejusdem generis*, to be limited to attempts to treat by medicine or surgery. That is made clear by the various amendments to the original act, in which the words "treating the sick" are not found. The Legislature by this amendment, "And any person attempting to treat the sick," intended to include those who practice neither medicine nor surgery, but who profess to cure, and who treat or attempt to treat the sick by means other than medicine or surgery—such as Chiropractic doctors.

4. —————: **Application of Rule: General Words.** The rule of *ejusdem generis* is resorted to merely as an aid in construction. If, upon consideration of the whole law upon the subject, and the purposes sought to be effected, it is apparent the Legislature intended the general words to go beyond the class specifically designated, the rule does not apply. If the particular words exhaust the class, then the general words must have a meaning beyond the class, or be discarded altogether.

5. **TREATMENT OF SICK: Chiropractic.** A "chiropractor" treats the sick. He does not call it treatment, but "adjustment;" but it involves both diagnosis and physical treatment. Where the evidence shows that what defendant calls "chiropractic" is based on the theory that all diseases are due to the impingement of the vertebrae upon the nerves passing between them, and that such impingement is due to a displacement of a nerve, and that the method of restoring the afflicted person to normal condition is to simply adjust the nerve and thereby remove the cause; and that he did not take the patient's temperature, nor examine the tongue, nor any part of the body except the spinal column, and asked no questions, but simply placed him on a cot, and felt up and down his spine, and adjusted the displaced vertebrae and relieved the impinged nerves, it shows that the practice involved skill, knowledge of anatomy,

diagnosis, and physical treatment, and was an attempt to "treat the sick or others afflicted with bodily or mental infirmities" within the meaning of Sec. 8315, R. S. 1899.

6. **PRACTICING MEDICINE AND SURGERY: Chiropractic.** The practice of medicine is not confined to the administration of drugs, nor is surgery limited to the knife. When a physician advises his patient to travel for his health, he is practicing medicine. Broadly speaking, one is practicing medicine when he visits his patient, examines him, determines the nature of the disease, and prescribes the remedies he deems appropriate. If he advises him to sleep in the open air he is treating him; but such advice is based upon knowledge of the patient's condition obtained by diagnosis. Hence, in the main, diagnosis is regarded as the test to determine whether a practice or treatment is included in the terms medicine and surgery. Tested by this rule, a defendant who calls himself a "chiropractor," is practicing medicine when he examines a patient's back, determines the trouble to be that a vertebra is displaced or "subluxated," thereby impinging the nerve, and proceeds to employ what he considers an appropriate remedy, namely, a sudden downward pressure of the fingers, thereby adjusting the vertebra and relieving the impingement.

7. **STANDARD OF COMPETENCY: To Treat the Sick: Wisdom of Law.** In determining whether or not the General Assembly had the power to enact a statute forbidding any one to treat the sick, who does not possess the technical knowledge required by the act to pass an examination before the State Board of Health, where such treatment does not involve such technical knowledge, and therefore in determining whether such statute denies to the people a constitutional right to determine, for themselves, how they shall be treated, and denies to citizens a constitutional right to pursue a lawful calling for a livelihood, the courts are not concerned about the wisdom or propriety of the act. Whether it is wise, necessary or proper, is a question for the General Assembly. The whole duty of the courts is to determine whether or not it is a reasonable exercise of the police power in the interest of the public health.

8. ———: ———: **Chiropractic: Unrestricted Right to Contract.** The Legislature has the power under the Constitution to pass all necessary laws to guard the morals, safety and health of the people, even if such laws, in some degree, operate as a restraint upon recognized constitutional rights. The people do not have an unrestricted right to determine how they shall be treated when sick, or when afflicted with physical or mental infirmities. Nor has any man an unrestricted right to pursue a lawful calling. The Legislature has the power to require

those who undertake to treat the sick to possess a prescribed competency. The Legislature had the power to enact the Act of March 12, 1901, forbidding any person, except physicians then registered, from "practicing medicine and surgery in this State," and any other person from "attempting to treat the sick or others afflicted with bodily or mental infirmities, without first obtaining a license from the State Board of Health." The act relates to the public health, and the requirements for competency and qualifications cannot be said to be capricious and unreasonable, even though its result may be to inhibit a harmless and useful treatment of the sick.

9. **PRACTICE WITHOUT A LICENSE: Chiropractic.** The practice of what is called "Chiropractic Science" without a license from the State Board of Health, is an offense under the laws of this State, and such laws are valid.

Appeal from Webster Circuit Court.—*Hon. Geo. H. Williams,* Judge.

AFFIRMED.

*Samuel Dickey, Wright Bros.,* and *Morris & Hartwell* for appellant; *T. B. Harvey amicus curiae.*

(1) The information is fatally defective in that it does not state that defendant Smith does not belong to one of the classes not included in the operation of the law. State v. Hamlett, 129 Mo. App. 70; State v. Connor, 142 N. C. 700; State v. Carmody, 50 Ore. 1; Marshall v. State, 119 S. W. (Tex.) 310. (2) The statute contemplates nothing but medicine and surgery. State v. Biggs, 133 N. C. 729; State v. Liffring, 61 Ohio 30; Nelson v. State Board, 22 Ky. L. Rep. 438; Hayden v. State, 88 Miss. 281; State v. McKnight, 131 N. C. 717; State v. Mylod, 20 R. I. 632; Smith v. Lane, 24 Hun 632; Bennet v. Ware, 61 S. E. (Ga.) 546. The Missouri courts have already decided that osteopathy, which is like chiropractic in that it does not administer drugs or remedies, and which consists principally in manipulating and flexing the body of the patient, is not the practice of medicine or surgery.

State v. School of Osteopathy, 76 Mo. App. 439. It is illogical to presume that the Missouri Legislature has taken the position that there is no science other than that of medicine, which, according to the statement of physicians themselves, has not to exceed a half dozen specifics of disease. Chiropractors practice neither medicine nor surgery. According to the undisputed testimony in this case none of the theories or agencies used by medicine are used by chiropractors. It also brought within the act those persons who "profess or attempt" to do the same thing. In other words it not only made it an offense to profess or attempt to actually practice medicine and surgery without complying with the law but also made it an offense to profess or attempt to practice medicine or surgery. The law was made to protect the public, not the doctors, and this provision was wisely added that the charlatan might be apprehended before the public should actually suffer at his hands, that any attempt to violate the law should be an offense as well as the actual violation of it. The rule that where special words are followed by general words, the general words will be held to apply to the same class of things as the special words is applicable here, the words "profess or attempt," etc., meaning "profess or attempt," etc., "medically or surgically." State v. Diness, 109 Mo. 434. This rule of *ejusdem generis* is most strongly and appropriately applied in construing penal laws and the courts are averse to holding guilty those whose acts are not within the concluding words. Shirk v. People, 131 Ill. 61; State v. Black, 75 Wis. 492; People v. Richards, 108 N. Y. 137; State v. Summer, 10 Vt. 587; McDude v. People, 29 Mich. 50; Nichols v. Paulson, 6 Ohio 305. The use of the word *treat* also shows the intention of the Legislature not to broaden the scope of the law beyond medicine and surgery. Statutory terms are interpreted in the commonly accepted sense. Again, effect, in this case disease, is treated. A cause is never

treated.   Medical men deal with remedies aimed at
the effect, disease.   Defendant Smith and the chiro-
practors do nothing with the effect, disease, but adjust
the cause.   At common law the healing sciences were
open to all without restriction.   Denton v. State, 21
Neb. 445; State v. Carey, 4 Wash. 424; State v. Morrel,
7 Ohio Dec. 52.   Penal statutes must be construed
strictly as against the accused, but liberally in his fav-
or, and they are not to be extended by implication to
cases not clearly within their terms.   Sutherland on
Statutory Construction, paragraphs 208, 349, 350;
Am. & Eng. Ency. Law, pp. 375, 377, 382; Hall v. State,
20 Ohio 7; United States v. Sheldon, 2 Wheat. 118;
Brooks v. State, 88 Ala. 122; Railroad v. Cohen, 49 Ga.
627.   Statutes in derogation of common right, such as
those restricting or regulating the pursuit of useful
occupations and callings, are to be construed strictly.
23 Am. & Eng. Ency. Law, pp. 383, 385, 386; Suther-
land on Statutory Construction, par. 367; Com. v.
Standard Oil Co., 101 Pa. St. 119; Gunther v. Lockey,
30 Ala. 591.   (3)   The statute under which the in-
formation is drawn, if it includes other healing sciences
besides medicine and surgery, is unconstitutional
and void as contrary to section 28, article 4, of the Con-
stitution of Missouri, in that it was passed and en-
acted as a bill containing more than one subject.   State
ex rel. v. Borden, 164 Mo. 221; State v. Persinger, 76
Mo. 346; State ex rel. v. County Court, 102 Mo. 351;
Shiverly v. Lankford, 174 Mo. 535; City of Kansas v.
Payne, 71 Mo. 159.   (4)   The statute relating to medi-
cine and surgery, under which the information is
drawn, is unconstitutional in this, that if it includes
healing sciences besides medicine and surgery it is in
contravention of section 28 of article 4 of the Consti-
tution of Missouri, because no intent to broaden the
scope of the act is expressed in the title. Gerhart v.
Railroad, 171 Mo. 84; State ex rel. v. Miller, 100 Mo.
439; State ex inf. v. Borden, 164 Mo. 221; State v.

Persinger, 76 Mo. 346; State ex rel. v. County Court, 102 Mo. 531; State v. Dinesse 109 Mo. 434; State ex rel. v. Backer, 129 Mo. 484; Witzmann v. Railroad, 131 Mo. 612; State ex rel. v. Heege, 136 Mo. 112; State v. Coffee & Tea Co., 171 Mo. 634. (5) The medical statute is void if .it includes other healing sciences besides medicine and surgery, as it attempts to define that as the practice of medicine and surgery which is not either the practice of medicine or surgery, and it undertakes to determine a question of science in that it undertakes to make any and all kinds of treatment of disease with or without the use of drugs the practice of medicine and requires the person so treating or attempting to treat to be licensed by the State Board of Health as a physician or surgeon, and furnish satisfactory evidence of having received a diploma from some reputable medical college of four years' requirements at the time of graduation. State v. Biggs, 133 N. C. 529; Bennet v. Ware, 61 S. E. (Ga.) 546; State v. Liffring, 61 Ohio 30; Nelson v. Board of Health, 22 Ky. L. Rep. 438. See cases cited under 2. Medicine has a well understood meaning and contemplates the administration of drugs, and surgery as clearly means the use of instruments. The Legislature in the exercise of the police power of the State has the right to regulate the practice of medicine and surgery and to fix the standard to be attained by those desiring to practice the same, but just as clearly, it seems to us, it has no right to include under medicine and surgery other methods of treating disease. When it undertakes to do that it goes too far, and undertakes to settle a question of science. It might as well undertake to say that two and two make five or that a horse is a cow as to say that a thrust with the hand is a drug or surgical instrument. (6) The medical act is illegal because it makes the lawfulness or the unlawfulness of the act depend upon whether or not a fee is charged. State v. Biggs, 133 N. C. 729. (7) If

it includes other sciences of healing besides medicine
and surgery the statute is unconstitutional and void
because it is an abuse of the police power of the State.
It is unreasonable and void because under the guise
of protecting the public's interest it imposes unusual
and unnecessary restriction upon the useful occupa-
tions. It is class legislation in that it compels all per-
sons desiring to practice medicine or surgery in this
State to furnish satisfactory evidence of having re-
ceived a diploma from some reputable medical college
of four years' requirements at the time of graduation,
regardless of the applicant's knowledge of medicine
and surgery, thereby making the receipt of said di-
ploma, and not the applicant's knowledge, the standard
from which to judge his qualifications. State v. Biggs,
133 N. C. 729; State v. Liffring, 61 Ohio 30; Nelson v.
State Board, 108 Ky. 769; Hayden v. State, 88 Miss.
291; State v. McKnight, 131 N. C. 717; State v. Mylod,
20 R. I. 632; Smith v. Lane, 24 Hun 632; Bennet v.
Ware, 61 S. E. (Ga.) 546.

*Elliott W. Major,* Attorney-General, and *Chas. G.
Revelle,* Assistant Attorney-General, for the State.

FERRISS, J.—This is an appeal from Webster
county, where the defendant was convicted of the of-
fense of treating and attempting to treat the sick and
afflicted without first having obtained a license from
the State Board of Health. His punishment was as-
sessed at a fine of fifty dollars. The case reaches this
court by transfer from the Springfield Court of Ap-
peals, upon a constitutional question.

The information upon which the defendant was
tried reads as follows: "J. E. Haynes, prosecuting
attorney, duly elected, commissioned, sworn, qualified,
installed, and acting as such in and for said county
of Webster, in the State of Missouri, upon his oath and
upon his hereto appended oath, informs the court, and
upon his said oath and upon his hereto appended oath,

does depose, present, aver and charge that said de-
fendant, George Smith, on or about the 1st day of July
1908, and from said date until November 6th, 1908,
at the said county of Webster, did then and there un-
lawfully, wrongfully, willfully practice medicine and
surgery, and did attempt to treat the sick or others
afflicted with bodily and mental infirmities, and did
then and there represent and advertise himself by
means of certain printed matter, the exact nature of
which is to this informant unknown, so as to indicate
that he was authorized to practice medicine and sur-
gery, and that he was authorized to treat the sick and
afflicted with bodily and mental infirmities, without
then and there having a license from the State Board
of Health, contrary to the form of the statute in such
cases made and provided, against the peace and dig-
nity of the State of Missouri.''

The information is based upon sections 1 and 5
of an act regulating the practice of medicine and sur-
gery, approved March 12, 1901 (Laws 1901, p. 207),
reading as follows:

"Section 1. It shall be unlawful for any person
not now a registered physician within the meaning
of the law to practice medicine or surgery in any of
its departments, or to profess to cure and attempt to
treat the sick and others afflicted with bodily or mental
infirmities, or engage in the practice of midwifery in
the State of Missouri, except as hereinafter provided.''

"Section 5. Any person, except physicians now
registered, practicing medicine or surgery in this
State, and any person attempting to treat the sick or
others afflicted with bodily or mental infirmities with-
out first obtaining a license from the State Board of
Health, as provided in this act, shall be deemed guilty
of a misdemeanor and punished by a fine of not less
than fifty dollars nor more than five hundred dollars,
or by imprisonment in the county jail for a period of
not less than thirty days nor more than one year, or

by both such fine and imprisonment for each and every offense, and treating each patient shall be regarded as a separate offense. Any person filing, or attempting to file, as his own, a license of another or a forged affidavit of identification, shall be guilty of a felony, and, upon conviction thereof, shall be subject to such fine and imprisonment as are made and provided by the statutes of this State for the crime of forgery in the second degree. Said fines to be turned into the State Treasury when collected.''

Said section 1 appears, without change, as section 8311 of the Revision of 1909, and section 5, with some amendments not material to the case at bar, appears as section 8315 of said revision.

The evidence shows that the defendant practiced what he called the ''science of chiropractic'' which science is thus defined in defendant's brief:

''The theory of this science is that the center and seat of all intelligence and bodily controlling force is in the brain; that all function depends upon this nerve force—universal intelligence, or whatever it may be, that is seated in the brain; that it is transmitted from the brain to the muscles and organs through, first, the spinal chord, and thence through the nerves radiating from the spinal column; that while it is not impeded, all bodily function is normal and the body is well; that when it is impeded, function is not normal, and the organ or muscle cut off from, or not in free communication with the brain, becomes diseased; that it can be impeded only by pressure or pinching of the nerves, known to the chiropractic as impingement; that nerves are impinged only where passing between bones; that they pass between bones in going through the intervertebral foramina, and are impinged when the vertebrae are from a blow, contraction of muscles, as by draught of cold air or other cause, more or less displaced or subluxated, as the chiropractor terms it. The slightly misplaced bones pinch or impinge the

nerves, impeding the flow of mental impulse. The effect is the same as the introduction of a rheostat or other resistance on the circuit between an electric dynamo at a power station and an electric motor supplying power for a factory. The motor represents a vital organ; not receiving the required amount of electricity, it is hindered in its work, just as a vital organ becomes diseased by not being in free communication with the brain. When all mental impulse is cut off, for example by what laymen term a broken back, the portion of the body and the organs beyond the point where the impulse is cut off become paralyzed, just as the motors of a huge shop, beyond a break in a wire leading from a dynamo, stop when the break is so complete as to cut off all or nearly all electricity coming to it. The experienced chiropractor, by passing his hand up and down the spinal column, is able to detect these subluxations or slight dislocations, and by a swift downward movement places the vertebrae back in their normal position, removing the pressure on the impinged nerve, and again opening up free communication between the brain and the organs controlled by the nerve so impinged.''

In actual practice the chiropractor makes no physical examination outside of the spinal column. He does not feel the pulse, take the temperature, prescribe any diet, or use any instruments. He simply examines the spinal column, determines whether or not a subluxation, as he calls it, exists, and if he finds it, adjusts the same. Defendant practiced according to this system. Testimony was given by one of his patients, by defendant himself, and by an expert brother chiropractor.

The evidence for the State tended to show that the defendant maintained an office in the town of Seymour, Webster county, Missouri, over the door of which was a sign reading, ''Chiropractor.'' He circulated through the community certain printed matter

in which he advertised and held himself out as "Dr. George F. Smith." His office was equipped with some charts showing the different parts of the human body and a table which the witness says was split in the middle, and upon which defendant placed his patient for examination and treatment. The witness called at defendant's office, received and paid for a chiropractic treatment, was placed on the table by defendant, who examined his spine, told him it was in a bad shape, and then manipulated and rubbed his spine with his hands and fingers.

Defendant was formerly a watchmaker by trade. He testified that he did not practice medicine; that he did not *treat* his patients, but *adjusted* them; that he did not consider the nature of the disease, but dealt only with the cause, and that this system of removing the cause by relieving the nerve impinged between the vertebrae of the back, applied to all diseases—small pox, measles, tuberculosis, etc. Further reference will be made to the facts in evidence in the course of the opinion.

I. It is claimed that "the information is fatally defective in that it does not state that defendant Smith does not belong to one of the classes not included in the law."

Section 8319, Revised Statutes 1909, the same being the last section of the article entitled "Medicine and Surgery," provides: "It is not intended by this article to prohibit gratuitous service to and treatment of the afflicted, and this article shall not apply to commissioned surgeons of the United States army, navy, public health and marine hospital service."

This objection is evidently based upon the rule that where an exception is contained in the act creating the offense, and constitutes a part of the description of the offense, such exception must be negatived in the information. The rule does not apply to this

case. The exception referred to, viz., treating the sick gratuitously, is not a part of the description of the offense. It simply exempts certain classes from the operation of the law, which is completely defined in the previous sections.

In State v. Doerring, 194 Mo. l. c. 414, the court, in discussing an objection to an indictment which charged the defendant with practicing dentistry without a license, which objection was that the indictment failed to negative the exception which was incorporated in a separate section, quoted from State v. O'Brien, 74 Mo. 549, as follows: ''When an exception is contained in a statute defining an offense, and constitutes a part of the offense, an indictment for such offense must negative the exception; but when the statute contains a proviso exempting a class therein referred to from the operation of the statute, an indictment need not negative the proviso. The accused must make the exemption a ground of defense.'' [Syllabus].

In State v. Connor, 142 N. C. 700 (cited by defendant), the rule is thus stated: ''When a statute creates a substantive criminal offense, the description of the same being complete and definite, and by a subsequent clause, either in the same or some other section, or by another statute, a certain case or class of cases is withdrawn or excepted from its provisions, these excepted cases need not be negatived in the indictment.''

So in State v. Carmody, 50 Ore. 1, it is said: ''Exceptions and provisos in a criminal statute need not be negatived in indictments unless they are descriptive of the offense, or a necessary ingredient in its definition.''

This court has held it to be the sound rule in this State that where the exception is contained in a subsequent section to the one which defines the offense, such exception need not be negatived in the information. [State v. Bockstruck, 136 Mo. l. c. 352.]

In the case at bar the exception, even if it were contained as a proviso in the section defining the offense, would not be descriptive of the offense, and hence would not require a negation in the information. The sufficiency otherwise of the information is not questioned.

II.   The statute in question does not violate section 28 of article 4 of the Constitution.   The act contains one subject, which is clearly expressed in the title.   The title of the act is not "Medicine and Surgery," as defendant asserts it to be in his brief. The words "Medicine and Surgery" are merely the caption.   The title to the act is as follows: "An act to regulate the practice of medicine, surgery and midwifery, and to prohibit treating the sick and afflicted without a license, and to provide penalties for the violation thereof." [Laws 1901, p. 207.]

The one "subject" of this act, within the meaning of the Constitution, is, broadly speaking, public health.  [State v. Marble, 72 Ohio St. 1. c. 36.]  Treating the sick is well within the subject, and is specifically covered by the title.   It is unnecessary to cite the cases in this State on this proposition.   This court has again and again, with patient repetition, expounded the law upon this constitutional provision, and the law so expounded is this: "Where all the provisions of a statute fairly relate to the same subject, have a natural connection with it, and are the incidents or means of accomplishing it, then the subject is single, and if it is sufficiently expressed in the title, the statute is valid."  [State v. Doerring, supra, and cases therein cited.]   The practice of medicine, or surgery, and the treatment of the sick by whatever means employed, are certainly germane to each other and are germane to the general subject of health.

"This section of the Constitution is to be reasonably and liberally construed and applied, due regard

being had to its object and purpose . . . If all the provisions of the bill have a natural relation and con- nection, then the subject is single, and this too though the bill contains many provisions." [State ex rel. v. Bronson, 115 Mo. 1. c. 276.]

If the treatment of the sick and the practice of medicine and surgery are not in natural relation, then it will be difficult to conceive of a case where two or more provisions in a bill relate to each other.

III. Defendant claims that the general words in the statute, "attempting to treat the sick," should, by the application of the rule of *ejusdem generis,* be limit- ed to attempts to treat by medicine or surgery, which are the special words preceding.

As early as 1877 the Legislature of this State enacted a law "to regulate the practice of medicine and surgery," and made it a misdemeanor for any person "to practice or attempt to practice medicine or surgery" without complying with the provisions of the act. This provision was carried through the various revisions up to and including section 8517, Revised Statutes 1899, excepting only that the words "attempt- ing to practice" were dropped, so that the revision of 1899 reads: "Any person practicing medicine or sur- gery in this State without complying with the provis- ions of this article," etc. The revisions of 1889 and 1899 also provided that "every person practicing medicine and surgery in any of their departments" should possess the qualifications therein specified. In 1901 article 1 of chapter 128 of the 1899 revision, re- lating to medicine and surgery, was repealed, and a new act passed covering the subject. Section 3 of the act provided that "all persons desiring to practice medi- cine or surgery in this State, or to treat the sick or afflicted as provided in section 1," should apply to the State Board of Health for examination.

This review of the history of the law affords a complete answer to the claim that the doctrine of *ejusdem generis* applies to this case. It is not a case of general words following a specific designation. There might be some ground for the claim if the general words "treating the sick" were in the original act. As shown above, until 1901 the only designation was "medicine and surgery." No one will claim that the general words, ",and any person attempting to treat the sick," added by amendment, are *ejusdem generis* with the specific words of the original act.

Furthermore this rule of *ejusdem generis* is, after all, resorted to merely as an aid in construction. If, upon consideration of the whole law upon the subject, and the purposes sought to be effected, it is apparent that the Legislature intended the general words to go beyond the class specially designated, the rule does not apply. If the particular words exhaust the class, then the general words must have a meaning beyond the class, or be discarded altogether. [National Bank v. Ripley, 161 Mo. l. c. 132; Lewis's Sutherland on Stat. Const., sec. 437.] Certainly the words "medicine or surgery in any of its departments" exhaust the genus or class.

It is obvious that the Legislature, by this amendment, intended to include those who practice neither medicine nor surgery in any of its departments, but who profess to cure, and who treat or attempt to treat, the sick by means other than medicine or surgery. Evidently the Legislature, in order to guard the over-credulous against injury that might result from yielding to the solicitations and professions of men who ignorantly undertake to diagnose and treat human ailments, deemed it proper, in the exercise of its police power, to require all persons, who undertake to so treat the sick, to show that they possess the qualifications which the lawmakers prescribe as essential.

233 Sup.—17

IV.   Defendant argued that the record shows that he did not "treat" his patients.   He calls what he did, not treatment, but adjustment.   He says that he does not treat disease; he "adjusts the cause."   Call it what you will the fact remains that the system of practice called in this case "chiropractic," as explained by defendant's witnesses and his counsel, involves both diagnosis and physical treatment.

The patient testified: "He laid me down on a cot, and he felt up and down my spine, and he said my spine was in bad condition."

The defendant testified: "I examined the spine with my fingers, and adjusted the subluxated vertebrae and relieved the impinged nerves.   Q.   How did you make the adjustment?   A.   By putting the fingers on the point of subluxation and giving a quick downward movement.   Q.   What did you do that for?   A.   To adjust the nerves.   Q.   What did you want to find the impinged nerves for?   A.   To remove the cause of the disease.   Q.   What do you mean by removing the cause of the disease?   A.   Well, simply this: The motory nerves begin in the brain and run through the spinal column, the spinal canal, and pass from there out to the different organs.   There is another nerve passing back to the brain.   We find the impingement of the motory nerve, which we call the cause of all trouble and the real trouble.   We simply find the impinged nerves and adjust them.   Q.   What do you mean by an impingement of the nerves?   A.   An impingement of a nerve is caused by what we know in chiropractic as a subluxation of the vertebrae; an impingement of the nerve carrying the impulse to the muscle or muscles from the brain to the organ using the nerve.   Q.   According to that, then all force is from the brain?   A.   Yes, sir; it all comes from the brain; everything will be normal unless there is an impingement of some nerve.   Q.   By impingement do you mean pressure?   A.   Yes, sir."

The foregoing practice clearly involves diagnosis; at least to a limited extent, knowledge of anatomy, and physical treatment. An expert witness for the defense, one educated as a regular physician and who had abandoned his practice and become a professional "chiropractor," testifies as follows:

"Q. Now, why does the chiropractor call upon a patient—you do call upon patients, although you may call it by a different name—why do you call upon an individual professionally? A. Because they want us to do so. Q. Now, when you go you request them not to tell you what is the matter? A. Yes, sir. Q. When you are called you expect to find something the matter? A. Indeed we do. Q. You make an examination of some kind, but you may call it by a different name? A. Yes, sir, p.————of the spine. Q. A physician who is in the regular practice makes an examination in addition to taking statements? He may go through a different process, but you are both trying to find out how the person is afflicted? A. Yes, sir. Q. If the person is not afflicted you do not offer any treatment? A. No, sir. Q. Now, then, if you do find he is afflicted you do give some kind of treatment; you may not call it treatment, but you go through some process? A. We go through a process. Q. The purpose of that process is to restore the man to a normal condition? A. Yes, sir. Q. In other words, you cure him or attempt to cure him? A. No, sir, we do not do any curing. Q. Before you had studied chiropractic you would have called it a cure? A. If I had accomplished it. Q. When a physician treats a man whom he finds out of normal condition, and restores him to a normal condition, he calls it a cure? Yes, sir. Q. When a chiropractor finds a man out of his normal condition what does he do? A. He removes the cause; we would remove the cause."

The defendant and his witness testify that they make no diagnosis; take no temperature; do not ex-

amine the tongue of the patient, nor any part of the body except the spinal column; that they do not treat the disease, but remove the cause, which is invariably found—no matter what the disease, whether consumption, small pox, or any other ill that flesh is heir to—located in the spine, and in every case consists in an impingement of the nerves caused by a "subluxation" —whatever that may be—of the vertebrae. Yet, notwithstanding all this, the practice does involve skill, knowledge of anatomy, diagnosis, and physical treatment.

V.   It is a serious question whether defendant would not come within the original statute, as one practicing medicine or surgery. The practice of medicine is not confined to the adminstration of drugs; nor is surgery limited to the knife. When a physician advises his patient to travel for his health, he is practicing medicine. Broadly speaking, one is practicing medicine when he visits his patient, examines him, determines the nature of the disease, and prescribes the remedies he deems appropriate. [Bibber v. Simpson, 59 Me. 181.] Tested by this rule the defendant was practicing medicine when he examined the patient's back, determined the trouble to be that a vertebra was subluxated, thereby impinging a nerve, and proceeded to employ what he considered an appropriate remedy, viz., a sudden downward pressure with the fingers, thereby adjusting the vertebrae and relieving the impingement. When the defendant says that he does not "treat" but "adjusts," and that he deals not with the "disease" but with the "cause," he is merely juggling with words. Changing the name does not change the thing.

The defendant cites several cases to support his contention that the Missouri statute does not include a practice which eliminates drugs and surgical instruments. We will examine them.

Two cases from North Carolina hold, under a statute which prohibits practicing medicine or surgery without a license, that an osteopath, and also one who "treats by massage baths and physical culture, manipulates the bones, spine and solar plexus, and kneads the muscles with the fingers of the hands, writes no prescriptions as to diet, but advises his patient what to eat and what not to eat, and the above is administered to the exclusion of drugs," are not included. [Biggs v. State, 133 N. C. 730; State v. McKnight, 131 N. C. 717.] These cases proceed upon the doctrine that the Legislature exceeds its power when it prohibits treatment of disease by any except a licensed doctor, and they are, therefore, not in point under the immediate discussion. [People v. Allcutt, 117 App. Div. (N. Y.) 546.]

The next case cited is State v. Liffring, 61 Ohio St. 39, which holds that an osteopath is not within a statute which provides that any person shall be regarded as practicing medicine who shall, for a fee, prescribe or direct any "drug, medicine or other agency for the treatment," etc.; that the doctrine of *ejusdem generis* limits the word "agency" to drugs or medicines, and that osteopathy is not such an agency. This statute was subsequently amended so as to read, "who shall prescribe . . . . any drug, medicine, appliance, application, operation, or treatment of whatever nature." In State v. Gravett, 65 Ohio St. 289, it was held by the same judge who rendered the opinion in the Liffring Case, to include osteopathy. The court said that the Legislature, in this amendment, had "attempted a comprehensive regulation of the practice of the healing art." [L. c. 307.] This same statute was held in State v. Marble, 72 Ohio St. 21, to include Christian Science.

The next case cited is Bennett v. Ware, 4 Ga. App. 293. That case involved a healing solely by supernatural or divine agency—by a "magic power direct

from the Lord"—and is, therefore, not in point. So also is the case of Mylod v. State, 20 R. I. 632, not in point, where it was held that Christian Science was not within a statute forbidding the "practice of medicine and surgery," without a certificate from the Board of Health.

Smith v. Lane, 24 Hun. 632, holds that a system of practice * consisting of "rubbing, kneading and pressure" performed with the hand, was not within a statute which penalized the "practice of medicine or surgery" without a license. This case is expressly overruled by the case of People v. Allcutt, supra, which latter case states that the doctrine of Smith v. Lane, and of cases that follow it, is opposed by Massachusetts, Maine, Michigan, Iowa, Missouri, Colorado, Nebraska, Illinois, Ohio, Alabama, Indiana, New Mexico, South Dakota, and Tennessee, which "refuse to restrict the 'practice of medicine' to the administration of drugs or the use of surgical instruments." [L. C. 552.] In the Allcutt Case the defendant described his system as "mechano-neural therapy," which meant "mechanical nerve treatment; a gentle pressure on all parts of the body; that the whole theory of this science is that disease comes from the lack of blood circulation, and that the treatment proceeds upon the theory of assisting the circulation back into normal condition." The analogy here to the "science" practiced by the defendant at bar is obvious.

Hayden v. State, 81 Miss. 291, rested upon a statute similar to the original Ohio statute. The court followed the Liffring and Mylod Cases, supra, but said that its own views would point to a different conclusion if followed. The holding was that osteopathy was not an "agency" within the meaning of the statute.

Nelson v. Board of Health, 22 Ky. L. R. 438, holds that a statute which forbids one to "practice medicine or attempt to practice medicine in any of its branches, or who shall treat or attempt to treat any sick or af-

flicted person by any system or method whatsover,''
does not include an osteopath. This ruling, however,
is put upon the ground, as was said in the Allcutt Case,
supra, that it would be beyond the power of the State
to prevent the practice of osteopathy, and therefore
it would be presumed that the Legislature did not in-
tend to include it within the statute; a doctrine which
does not prevail in this State, as we shall show
later on.

We do not desire to extend this opinion by citing
on this point numerous cases which hold contrary to
the defendant's contention. Some of them are Parks
v. State, 159 Ind. 211; State v. Yegge, 19 S. D. 234;
Bragg v. State, 134 Ala. 165; State v. Buswell, 40 Neb.
158.

In the main, the cases regard diagnosis as the
576, Davidson was seeking to recover for services
rendered in giving electrical treatment. The defense
was that Davidson was practicing medicine without
a license. [Statute of 1879.] It was urged in his be-
half that the services rendered were not medical. He
held a diploma from an electric medical college.
Judge THOMPSON, speaking for the court, in denying
Davidson's contention, said: ''The obvious intention
of the statute was to embrace any person who habitu-
ally holds himself out as a professor of the art of
healing diseases.''

In the main, the cases regard diagnosis as the
test to determine whether a practice or treatment is
included in the terms medicine and surgery. This is
a practical test. A doctor who advises his patient to
sleep in the open air is treating him. Such advice,
however, is based upon a knowledge of the patient's
condition obtained by diagnosis.

The defendant professed to be able to ascertain
by examination of the patient the *cause* of his trouble;
a result rather beyond that which ordinarily attends
the diagnosis of the regular practitioner. The method

or extent of the examination is not the controlling feature. When the practitioner makes such examination of the patient as he regards sufficient to indicate to him the cause of the trouble, and to indicate its proper treatment, he has diagnosed the case.

VI.   This brings us to defendant's last contention, which is thus expressed in his brief:

"If it includes other sciences of healing besides medicine and surgery the statute is unconstitutional and void, because it is an abuse of the police power of the State of Missouri. It is unreasonable and void because, under guise of protecting the public's interest, it imposes unusual and unnecessary restrictions upon the useful occupations. It is class legislation in that it compels all persons desiring to practice medicine or surgery in this State to furnish satisfactory evidence of having received a diploma from some reputable medical college of four years' requirements at the time of graduation, regardless of the applicant's knowledge of medicine and surgery, thereby making the receipt of said diploma, and not the applicant's knowledge, the standard from which to judge his qualifications."

In discussing this proposition we are to deal with one question only—the power of the Legislature to pass this law. We are not concerned about its wisdom or propriety. Whether the law is wise, necessary or proper, is a question for the makers of the law. It is contended that to so construe this statute as to forbid any one to treat the sick without possessing the technical knowledge required to pass an examination before the State Board, where such treatment does not involve such technical knowledge, would result in denying to the people a constitutional right to determine how they shall be treated, and also denying to citizens the constitutional right to pursue a lawful calling for a livelihood; in short, that such a construc-

tion amounts to a deprivation of both liberty and property.

This contention begs two questions: 1st, Have the people an unrestricted right to determine how they shall be treated? 2nd. Has a man an unrestricted right to any lawful calling?

The Legislature has the power under the Constitution to pass all necessary laws to guard the morals, safety and health of the people, even if such laws in some degree operate as a restraint upon recognized constitutional rights. An absolute right to liberty, or property, or even life itself, does not exist. The State may, and does, deprive its citizens of either of these so-called constitutional rights. When the lawmaking power forbids the manufacture of liquor, an absolute destruction of property results. Yet this may be done, in the exercise of the police power. Our jails and penitentiary are filled with inmates who have been deprived of their liberty for the public good. The power of the State to deprive its citizens of their lives for the public good has never been questioned. In other and various ways citizens, for the public good, may be deprived of liberty and property. True, these rights of the citizens are to be impaired only when necessary for the public good. But who is to judge whether the necessity exists? The authorities agree that this power of judgment lies with the Legislature. If, under the guise of the police power, the Legislature unreasonably and capriciously restrains one's liberty or property, the court may interpose the Constitution and declare the law void.

This court in State v. Fisher, 52 Mo. 174, said: "A law which unnecessarily and oppressively restrains a citizen from engaging in any traffic, or disposing of his property as he may see fit, though passed under the specious pretext of being preservative of the health of the inhabitants, would be void." Yet, in that case the court sustained a law which gave certain per-

sons an exclusive privilege to render dead animals, and prohibiting all others, on the ground of public health. So in State v. Addington, 77 Mo. 110, this court approved a ruling by Judge THOMPSON of the Court of Appeals, that "the police power is a power to be exercised within wide limits of legislative discretion; and if a statute appears to be within the apparent scope of this power it would be a usurpation of jurisdiction for the judicial courts to inquire into its wisdom and policy, or to undertake to substitute their discretion for that of the Legislature." [State v. Addington, 12 Mo. App. l. c. 221.] The Addington Case involved the validity of a statute which prohibited the manufacture of oleomargarine. This court sustained an objection to evidence offered by the defendant to prove that oleomargarine was a healthful and useful food.

In the case of Booth v. Illinois, 184 U. S. 425, the United States Supreme Court had under consideration a statute of Illinois declaring option contracts illegal. It was contended that the Legislature did not intend to prohibit bona-fide options, but only those that were gambling contracts; that if it did intend to prohibit lawful option contracts, such act was beyond the scope of its police power. The Supreme Court of Illinois had construed the act to "declare that unlawful which had theretofore been lawful," and to include lawful options. The question before the United States Supreme Court was, "taking the statute to mean what the highest court of the State says it means, is it unconstitutional?" [L. c. 428.] Judge HARLAN, speaking for the court, says: "The argument then is that the statute directly forbids the citizen from pursuing a calling which, in itself, involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the Legislature is without power to

forbid or suppress a particular kind of business, where such business, properly and honestly conducted, may not, in itself, be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law. [Mugler v. Kansas, 123 U. S. 623, 661; Minnesota v. Barber, 136 U. S. 313, 320; Brimmer v. Rebman, 138 U. S. 78; Voight v. Wright, 141 U. S. 62.]''

In Ex Parte Lucas, 160 Mo. 1. c. 232, this court approved the following ruling by the Supreme Court of Minnesota: ''Laws enacted for the purpose of regulating or throwing restrictions around a trade, calling, or occupation, in the interests of the public health and morals, are everywhere upheld and sustained. Such laws are within the police power of the State, and are universally sustained where enacted in the interests of the public welfare. The question presented in cases where the validity of such laws is called in question is no longer the power or authority of the Legislature to enact them, but whether the occupation, calling or business sought to be regulated is one involving the public health and interests. A person engaged in such an occupation is not alone interested therein. The public served by him is also interested. He is interested to the extent that it provides and furnishes him with employment and a means of livelihood.

The public is interested in his competency and qualifications, and it is eminently proper that there be thrown around the calling protection from intrusion by incompetents and others inimical to the public good.''

It is unnecessary to refer further to the repeated declarations of this court to the effect that the Legislature has the power to regulate, in such manner as it may think proper and wise, callings that are related to the public health.

Applying the principles announced to the case at bar, we cannot say that an act which forbids treatment of the sick by one not possessing certain technical knowledge evidenced by a license bears no reasonable relation to the purpose sought to be accomplished by the Legislature, namely, the protection of the public health. The Legislature thought, perhaps, that this act was necessary to protect credulous sick people from injury at the hands of charlatans and quacks, with their specious promises of a sure cure without drugs; or, it may have been thought necessary to forbid harmless practices in order to insure protection against those that are dangerous and hurtful. Sick people sometimes grow desperate in their search for a cure, or their judgment becomes weakened, so that they fall an easy prey to the ingenious and varied devices of the pretended healer. We know that some people are prone to give more weight to a skillfully worded advertisement than to the advice of a competent physician. The Legislature, no doubt, thought that in view of all these considerations, the welfare of the people required the sweeping law of 1901.

The method of practice disclosed by this record may be harmless and useful, but it is a treatment for the sick, related, to say the least, to the practice of medicine or surgery, and so is within the terms of the statute. The Legislature may have been mistaken in thinking it necessary to forbid such a method of

practice, but the act was passed in the exercise of its police power, and we are not prepared to say judicially that such exercise of the power was either unreasonable or capricious, or that it bears no relation to the public health.

The judgment is affirmed. *Kennish, P. J.,* and *Brown, J.,* concur.