The People of the State of New York, Complainant, *v.* Frederick C. Zinke, Defendant.

City Magistrates' Court of New York, Borough of Brooklyn, Tenth District, November 18, 1938.

*John J. Bennett, Jr., Attorney-General* [*Sol Ullman, Assistant Attorney-General,* of counsel], for the complainant.

*James J. Munro,* for the defendant.

Sabbatino, C. M. Defendant has been charged with the crimes of unlawfully practicing medicine in the county of Kings on various dates and unlawfully using a designation tending to imply or designate him a practitioner of medicine in violation of sections 1251 and 1263 of the Education Law. He has conceded for the purposes of a motion to dismiss the complaint that the facts stated therein would be testified to on a hearing before this court, and he claims that the facts affirmatively show that the defendant is not guilty of the crimes charged.

It appears from the complaint, which is somewhat detailed, that defendant maintained an office in Brooklyn, N. Y., for the practice of what is known as " chiropractic." On his office windows the title " chiropractor " was displayed and that title also appeared together with his name on his letter box in the building in which his office was located. In his office hung certificates, issued to him by the Palmer School of Chiropractic, representing defendant to be a " D. C." (meaning chiropractic doctor) and a " Doctor of Chiropractic." He used professional cards bearing his name, title " chiropractor," office address and office hours, and telephone number. His name and title " chiropractor " were listed in the telephone directories of the city of New York.

The Department of Education caused an investigation to be made of defendant's activities. Three special investigators called on defendant at his offices on several occasions during the period specified in the complaint. Their experiences are somewhat similar.

One of the investigators was asked by defendant's attendant whether it was her first visit to the " doctor." When told it was, the attendant inquired as to who recommended her. That question having been answered, the investigator was referred to defendant. He, too, inquired as to who recommended the investigator and the investigator gave the same response as was given to defendant's attendant. Defendant was then told by the investigator that she had pains in her back and frequent headaches. He responded that " he doesn't practice medicine, diagnose or prescribe medicines, but all he did was to give chiropractic treatments and adjustments." After she had partly disrobed, he pressed an instrument on her back and moved it up and down the spine. This instrument is known as a neurocalometer, the purpose of which is to indicate nerve conditions.

He jerked her head from side to side. While she was on an adjustment table he manipulated her spine. Arrangements were made by defendant for a series of treatments and he fixed the cost thereof at ten dollars, which was subsequently paid. The investigator was told to return for further treatment on a specified date. The investigator subsequently received further like treatments from defendant on several other occasions. During the course of the treatments she told him of her condition and that the " pain in her back was quite severe," as to which defendant stated that " the weather didn't help it any." She informed defendant that her pains in her back and thighs had become severe and she had been nauseous all day and at night had a vomiting spell. He told her that he did not believe the nauseousness was caused by his treatment, that she must have upset her stomach, that the pain in her back would right itself and that a preparation she was using could do no harm. She asked him whether the tumor on her back might be the cause of her backache and headaches and he said, after examining it, that it was not the cause. The investigator had injured her foot and her ankle was swollen and her foot pained her. Defendant pressed along her spine and then asked whether the investigator's foot felt any better, and she said it did.

Another of the investigators told defendant " that she got severe headaches, that her nose was clogged, that she could not sleep nights because it was difficult for her to breathe and that she had pains from her nose through her eyes up to the top of her head."

He inquired whether her headaches were more severe when she had her menstrual period. She told him she did not notice any difference and that she was worried about her condition and asked defendant whether it was a sinus condition. He told her not to worry " and that she would leave his place minus the headache." He then pressed the neurocalometer against her spine, and, while she was on the adjustment table, he manipulated her spine. He asked her whether her head still ached and she told him it felt a little better. On a subsequent occasion he told her that her pain came from " nervous pressure." He said he would not suggest a diet for her and advised against other forms of relief and told her to continue with his treatments and have patience.

The third investigator was also questioned by the attendant as to who recommended her to defendant and like inquiry was made of her by defendant. When she mentioned to defendant that she had been sent to him by reason of the pains in her back, he said he would not diagnose her case but would just give her adjustments because it was against the law for him to tell her what was wrong with her or to tell her he could help her. She said that she had pains in her back and wanted him to help her. After she had partly disrobed and put on a robe he pressed something up and down her back and then wrote something on a card. He jerked her head from side to side and manipulated her spine with his hands while she was on the chiropractic table. She rested and arranged to return on a later date. On a subsequent visit defendant gave her a like treatment, at which time defendant fixed his fee for three treatments, which was paid him, and he told her to return on a date he fixed. On a further visit the investigator told defendant she had been quite sick and he told her she must have patience and " he was sure everything would work out all right." She mentioned to him that she was afflicted with bleeding hemorrhoids and expected her menstrual period any day, and she asked if it would be all right to get a treatment if she was in that condition as she thought it might cause harm. He said that, on the contrary, his treatment would help her, and as to clearing up the hemorrhoids, she should " just wait and see," adding that some people respond to the treatments more quickly than others, and it might take a little longer to notice any change in her condition. She called his attention to a condition to the left of her stomach beneath her left breast and told him it seemed as though something was moving there — a sensation similar to that she felt when she was to have a child, and defendant said it might be gas but not to worry about anything as he was sure she would be all right.

Though the complaint, which consists of the affidavits of the investigators, contains much detail, the above are the salient features. Whether or not thereby the crimes charged are sufficiently set forth must be ascertained by an examination of the controlling provisions relating to the practice of medicine which appear in the Education Law. In section 1250, subdivision 7, the practice of medicine is defined as follows: " A person practices medicine within the meaning of this article, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition."

Section 1251 prohibits the practice of medicine by the unlicensed, and section 1263, paragraph 2, provides, amongst other things, that any person " who not being lawfully licensed or authorized to practice medicine within this State shall (a) practice or advertise to practice medicine; or (b) use in connection with his name any designation tending to imply or designate him as a practitioner of medicine * * * shall be guilty of a misdemeanor." In section 1263, paragraph 5, it is provided that it is only necessary to prove a single act prohibited by law or a single holding out or attempt without proving a general course of conduct in order to constitute a violation of the medical regulations. Also, the same section and paragraph creates a rebuttable presumption of a holding out and of the practice of medicine should it appear that the person accused has displayed " a sign or an advertisement bearing a name as a practitioner of medicine in any manner or by implication."

Defendant claims, and it is his only contention, that from the complaint it does not appear that defendant held himself out to be able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition. That is indisputably one of the elements of the practice of medicine as provided for in the definition of the practice of medicine. That defendant held himself out to be able to perform one of these acts must be established in addition to an undertaking or offer to perform any one of the acts. To support his contention that there is no proof of a holding out, defendant urges that defendant actually negated a holding out when he informed one of the investigators that " he doesn't practice medicine, diagnose or prescribe medicines but all he did was to give chiropractic treatments and adjustments," and when he informed another investigator that he would not diagnose her case but would just give her adjustments for it was against the law for him to tell her what was wrong with her or that he could help her.

On the other hand, the People claim that the facts sufficiently show a holding out, not alone directly but also inferentially from the acts performed. The People also assert that the statements made by defendant, which defendant claims negate a holding out, constitute a subterfuge to circumvent the law.

The court finds that there was directly and by inference a holding out by defendant that he was able to perform one or more of the prohibited acts. He displayed certificates bearing his name as a " Doctor of Chiropractic " and signs bearing his name as a " chiropractor," and he listed himself as a chiropractor in the telephone directories. These signs and certificates are in themselves presumptive evidence of a holding out under the statutory presumption above set forth — the titles " doctor " and " chiropractor " carry with them definite implications that the possessor of those titles is able to treat bodily conditions. (*People* v. *Somme*, 120 App. Div. 20; affd., 190 N. Y. 541; *Commonwealth* v. *New England College of Chiropractic*, 221 Mass. 190; 108 N. E. 895.)

The whole set-up of defendant's office, attendant, dressing rooms and split-back robes, neurocalometer and articulated table, all have a direct bearing on the holding out — they consisted of equipment of one who uses same as preliminary to and in the actual treatment of physical conditions. One of the investigators inquired of defendant whether she had sinus trouble and he told her she should not worry and she would leave his place " minus " the headache and she should continue with his treatments and have patience — certainly thereby he represented he was able to treat her conditions. He told another investigator that his treatment would not harm her menstrual condition but would help her and as to her hemorrhoid condition she should just wait and see, and that she should not worry for he was sure she would be all right — one making such statements must be deemed to have held himself out as being able to make that person " all right " by his treatments.

Aside from the direct holding out, there is an implied holding out from the acts performed. From the taking of the histories of the patients and his subsequent treatments and the acceptance of compensation therefor there is an inference of a holding out. The Court of Appeals has held, in a case involving the practice of chiropractic, that in offering to treat a person, the practitioner holds himself out as qualified to give treatment. (*Brown* v. *Shyne*, 242 N. Y. 176, 181.) In *People* v. *Lucas* (198 N. Y. Supp. 846, 849) the Supreme Court held, with regard to a charge of unlawfully practicing medicine, that " A single instance may be sufficient to establish a holding out, where there is an actual treatment, for

in such a case the treatment itself would make out a *prima facie* case of representation." The practitioner need not assume or claim to be a physician in order to bring his acts within the statute. (*People* v. *Lucas*, 198 N. Y. Supp. 846; *State* v. *Bresee*, 137 Iowa, 673; 114 N. W. 45; *Bibber* v. *Simpson*, 59 Me. 181.)

In view of the statements made by defendant and his acts, all constituting a holding out, any negation of a holding out by defendant cannot be viewed seriously. If any such negation were considered controlling in the circumstances here existent the medical regulations could readily be nullified and rendered a dead letter. To this court the negation is but a false pretense, for defendant proceeded to perform the very acts which he pretended he did not perform. And defendant's use of the terms "chiropractic treatment" and "adjustments" is nothing more than an effort to evade the statute and the court will not be taken in thereby. (*Kuechler* v. *Volgmann*, 180 Wis. 238; 192 N. W. 1015.) In that case the Supreme Court of Wisconsin, after holding that the defendant chiropractor undertook to diagnose and treat, said: "Diagnosis is ordinarily assumed and performed by licensed medical or osteopathic physicians. But it may be assumed by others, and it is held that the practice of chiropractic is the practice of medicine. * * * And the fact that chiropractors abstain from the use of words like *diagnosis, treatment,* or *disease* is immaterial. What they hold themselves out to do and what they do is to treat disease, and the substitution of words like *analysis, palpitation,* and *adjustment* does not change the nature of their act."

Defendant diagnosed. His history taking, examination with the use of a neurocalometer and his statements as to the causes of conditions of the investigators show that he had made a determination which he deemed sufficient for the purposes of treatment. The term "diagnosis" is derived from the Greek prefix "dia," meaning between, and "gignoskein," meaning to discern. It is, in modern terminology, a "sizing up" or a comprehending of the physical or mental status of a patient. It is the conclusion itself rather than the procedures upon which the conclusion is based which constitutes a diagnosis *per se*. No particular language need be used and no disease need be mentioned, for the diagnostician may make or draw his conclusion in his own way.

As said by the United States Supreme Court of a practitioner who claimed he helped ailments by scientific manipulations, "He like others must begin by a diagnosis." (*Collins* v. *Texas*, 223 U. S. 288, 296.) A practitioner has diagnosed a case when he "makes such examination of the patient as he regards sufficient to indicate to him the cause of the trouble and to indicate its proper treatment." (*State* v. *Smith*, 233 Mo. 242, 264; 135 S. W. 465.) "It

is no answer to say that in many instances the diagnosis is easy — that a man knows it when he has a cold or toothache." (*Collins* v. *Texas*, 223 U. S. 288, 296; *People* v. *Ellis*, 162 App. Div. 288.)

Defendant undertook and offered to treat. The definition of the practice of medicine states that the treatment may be by " any means or method." Defendant's method was manipulation of the spine — what is known as the practice of chiropractic. In 11 Corpus Juris, 758, chiropractic is defined as " A system of healing that treats disease by manipulation of the spinal column." It is said in *Brown* v. *Shyne* (242 N. Y. 176, dissenting opinion by CRANE, J., at p. 184): " We readily see, therefore, that the chiropractic doctor holds himself out to treat and cure sickness and disease by the readjustment of the spinal column and the proper alignment of the vertebrae." (See, also, *People* v. *Meyer*, 209 App. Div. 908; affd., 239 N. Y. 608; *People* v. *Ellis*, 162 App. Div. 288; *People* v. *Lee*, 151 Misc. 431, 436; *People* v. *Eifersen*, 136 id. 32; *People* v. *Scholz*, 28 N. Y. Crim. Rep. 357; *State* v. *Young*, [Mo. App.] 215 S. W. 499; *Commonwealth* v. *Byrd*, 64 Pa. Super. Ct. 108.)

In *People* v. *Ellis* (162 App. Div. 288) the Appellate Division, Second Department, reviewed a conviction of a chiropractor, a graduate of the Davenport University of Chiropractics, of unlawfully practicing medicine. In affirming the conviction the court said: " Appellant's office sign, his circular and professional card, as well as his own frank admissions as a witness, all show that he holds himself out as able to diagnose, treat and prescribe for pain, disease and injury. Rubbing and pressure on the human joints are old therapeutic agents. When accompanied by such attempts at diagnosis as the statement that a patient's pains in the ankle were from the spine having come out of alignment through displaced vertebrae, appellant's acts come within the statutory definition of the practice of medicine."

Tested for the foregoing principles, facts also sufficiently appear in support of the charge that defendant unlawfully used a designation implying him a practitioner of medicine. (Education Law, § 1263, subd. 2 [b].)

As a chiropractor is one who practices chiropractic, and as chiropractic is a theory or system adopted by those who claim to be able to treat disease by spinal manipulation, it follows that the designation chiropractor tends to imply the user thereof a practitioner of medicine. " It would tend to lead the public to the conclusion that persons so announcing themselves were qualified physicians, surgeons, or osteopaths as well as chiropractors." (*State* v. *Michaels*, 226 Wis. 574; 277 N. W. 157.)

This court is not concerned on defendant's motion to dismiss with whether chiropractic treatments are beneficial or injurious.

The only question is whether the facts stated in the complaint show that defendant violated the law. The proof at the trial will necessarily be confined to the particular acts which it is claimed constitute a violation. But, in view of contentions of defendant as to the purpose of the statutes regulating the practice of medicine, this court desires to emphasize that the Legislature of this State has in its wisdom recognized the necessity of protecting the people by prohibiting those not licensed from meddling with their health. Especially is that important as to female sufferers who enter the office of an unlicensed practitioner where they are required to partly disrobe and then submit to various forms of bodily manipulations. The Court of Appeals recently said in *People ex rel. Bennett* v. *Laman* (277 N. Y. 368, 374), wherein a complaint for an injunction restraining a chiropractor from practicing medicine was sustained, that " The regulation of the practice of medicine is undertaken by the State not for the protection of the physicians themselves, but for the protection and welfare of the people. ' The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud.' (*Dont* v. *West Virginia*, 129 U. S. 114, 122; *People* v. *Mulford*, 140 App. Div. 716; affd., 202 N. Y. 624.) Those seeking medical attention have no means of estimating the skill and ability of the physician, and must depend upon the State to permit only those qualified to engage in that profession."

The courts have continuously denounced those who would endeavor to evade the medical regulations. In *People* v. *Mulford* (140 App. Div. 716; affd., 202 N. Y. 624) the court said (p. 719): " A patient may often suffer as well from a failure to prescribe proper remedies, or afford surgical relief promptly, as from making improper prescriptions, or performing unskillful operations. A physician who holds himself out to treat patients for physical ills, should know whether to do anything and what to do to relieve his patient, otherwise he should not be permitted to practice, and impose upon the unfortunate sufferers who like the poor are always with us, and many of whom need the protection of the State, against quacks in and out of the profession of medicine. I have no sympathy with this class of practioners who seek to remain outside the control of the State, for the welfare of the people."

There is reasonable ground to believe that defendant is guilty of the crimes charged and the court directs that he be held to answer in the Court of Special Sessions of the City of New York, County of Kings.