Wanamaker, J.
Notwithstanding this court has sustained the constitutionality of the Medical Practice Act, both general and limited, in Nesmith v. State, 101 Ohio St., 158, and Shaw v. State, Id,., 507, we have decided upon another review of these constitutional questions, as though they were originally before this court.
Public health is the very heart of public happiness. The constitutional guaranties of life, liberty and the pursuit of happiness are of little avail unless there be clearly implied therefrom the further guaranty of safeguard of the public health, in order that life, liberty, and the pursuit of happiness, shall be made practical and plenary.
The legislative power of the state, which is here called in question, is limited only by the constitution of the state and the constitution of the nation; and before any legislative power, as expressed in a statute, can be held invalid, it must appear that such power is clearly denied by some constitutional provision.
It is likewise conceded that the Medical Practice Act must be justified, if at all, under the police power of the state.
The dimensions of the police power of the state are the dimensions of the public need, save only such limitations as are imposed by our written constitutions.
*308 Of late years the doctrine of conservation has received a new impetus in our American system of government. Originally, this doctrine was applied largely to mines, forests, water-power, and our natural resources. Later it was extended to hogs, cattle, buffalo and wild animals generally, and, strange to say, lastly it was applied to human beings. Sanely and sensibly it was argued that life is worth little in the abstract, but must be made effective by the conservation of the health to which that life is entitled.
Man is still the greatest mystery to man. His mind and body are the greatest workshop of the world. The chemical and organic forces, operating in life and in death, in every possible variety of action and reaction, make him the most interesting study of natural science.
Over this wonderful laboratory, Doctor Nature presides. His remarkable management of the human organism, in preserving its orderly functions, is excelled in no other department of the universe. If uninterfered with or unhandicapped by any artificial circumstance or agency, he has within his laboratory the necessary cure for the major part of all the ills that human flesh is heir to.
As the Great Physician he has charge of this great laboratory that furnishes not only the motor power for all human activity, but likewise the curative- agencies for the abnormal conditions that frequently arise from the abuses, excesses and exposures of human life.
The most that any human physician can do by way of cure of human ailments is to aid or facili *309 tate Doctor Nature’s general plan. Manifestly, in order to do this, there must be a thorough knowledge of the workings of nature in the various departments of human life, the alimentary, the circulatory, the respiratory, the nervous, and all other departments that coordinate and cooperate in human life.
In order to intelligently and effectively cooperate, the human physician must have equal knowledge with Doctor Nature as to this human laboratory, its chemical and organic ailments, agents, and forces, else they will work to cross-purposes with each other.
This would seem too obvious to require further argument.
In primitive life every man was his own dentist, doctor, lawyer. Why? Because there were no specialists, and one man was about as smart as another. In the course of our civilization and education we came to realize that in many departments of life special knowledge and training.were highly necessary, and that the time had gone when any person had the right to assume that he could skillfully exercise the healing art, advertise to such effect, and induce the public to believe he was so qualified, without the slightest evidence of such qualification.
Accordingly the states, now nearly all of them, have adopted a wise and salutary policy, that before persons shall engage in certain occupations that require special expert knowledge, training and experience, and as to which the general public have little or no knowledge, they must qualify before *310 some board especially fitted to test them through some preliminary and appropriate examination, to ascertain their personal fitness to practice such special business or profession, in order to insure the public of their efficiency before securing the public’s confidence and the public’s cash.
It would seem obvious that in the exercise of the art of healing the human body it would be of primary importance to thoroughly know and understand the human body, its anatomy, physiology, hygiene and chemistry, through acquaintance with the structure of all the different organs 'of the body, their relation to each other, their several functions, separate and in conjunction with the other organs of the body, in their normal state, so as to be able to determine the nature and extent of any abnormality, which is always at the basis of disease.
It is surely only elementary to say that before one can treat a disease intelligently and efficiently he must know much about the nature and extent of that disease, the organs and parts affected, and even, the cause of that disease. All these things and many more enter into an intelligent, practical and effective treatment.
Every business and science has a language all its own. One of the first terms confronting us in the art of healing is the scientific term “pathology,” which relates to the nature, cause, progress and symptoms of a disease. Surely no argument is needed to convince one that such knowledge is highly essential to a proper diagnosis; that is, the determination of the particular disease or ailment from which the patient is suffering. After de *311 termining such disease, then comes the application of the appropriate remedy.
As to pathology there should be no substantial dispute between any of the different schools of the healing art. It deals with the objective analysis, a survey of the human body and its ailments or diseased organs and parts. Likewise as to the diagnosis of the signs or symptoms, internal or external, connected with the diseased condition. These also are largely objective and the result of scientific survey. We next come naturally to the science of therapeutics, which relates to the discovery, selection and application of the remedies for diseases. As to this field of medical science there have been in times past very serious scholastic controversies, but, as with the sectarian differences in the various churches, so in medical science, there has been a gradual liberalizing and yielding of former intense partisan and scholastic differences to the more practical test, “By their fruits, ye shall know them.”
If there be that thorough, scientific and practical knowledge of pathology, and that skilled scientific knowledge of diagnosis, then the state may safely leave the choice of' remedy or cure very largely to the judgment of the practitioner. At least, his expert knowledge, derived from experience and education, should best fit him to make that choice, and a wise application of the remedy.
But, obviously, as to these two major essentials of professional equipment, the state should set its standards high, so as to abundantly protect the pub- *312 lie from the mistakes of ignorance, however well intentioned, from charlatanism, from professional quackery, however garbed in alluring advertisement, and from all those who would prostitute their profession to a profiteering basis.
Manifestly, before this scientific knowledge of the human body can be properly acquired, there must be some preliminary educational qualifications of a general nature. In mathematical science one does not study geometry before the multiplication tables. One does not study chemistry before mathematics. A solid and adequate foundation in the nature of the substructure is as essential in the building of an education as it is in the building of a block.
It is absurd for anyone to say that you can develop and train a rude hod-carrier, with comparatively no education, to become a skilled physician or surgeon, in the same time that you can a college man with the same natural endowments.
The Medical Practice Act of Ohio recognizes the necessity of these preliminary qualifications, and before entering upon the study of the art of healing the general assembly by Section 1270 of the Medical Practice Act has wisely provided:
“The following preliminary educational credentials shall be sufficient:
“A diploma from a reputable college granting the degree of A. B., B. S., or equivalent degree.
“A diploma from a legally constituted normal school, high school or seminary, issued after four years of study:
*313 “A teacher’s permanent or life certificate:
“A student’s certificate of examination for admission to the freshman class of a reputable literary or scientific college.”
The state medical board has recognized and adopted in effect these reasonable requirements in general'educational lines, before anyone may take the examination for the general practice of the art of healing.
, These are not made imperative, but their equivalent at least must be possessed by the applicant. In addition thereto “the applicant must also produce a certificate issued by the entrance examiner and a diploma from a legally chartered medical institution in the United States, in good standing, as der fined by the board, at the time the diploma was issued, * * * or a diploma or license approved by the board which conferred the full right to practice all branches of medicine or surgery in a foreign country.”
These in a general way constitute the preliminary qualifications to an examination for the general practice of medicine and surgery in the state of Ohio. Surely there is nothing arbitrary, discriminating, irrelevant or unreasonable about these qualifications from the viewpoint of personal and professional fitness for efficient public service in the conservation of the public health. Neither are there well-founded objections to be taken to any of the other sections of the act as a whole, so far at least as relevant to this case.
The claim is made, however, that the right of liberty to contract, guaranteed by both the state and *314 federal constitutions, denies to the state legislature the power to restrict the same by prescribing such qualifications for the practice of medicine and surgery as are prescribed by the Medical Practice Act. The authorities, however, are substantially uniform that the legislature may enact reasonable regulations for the examination and registration of physicians and surgeons and for the practice of medicine and surgery and the art of healing generally. This authority is recognized as full and complete, applying both to ethical and educational standards, in which the legislature is given a wide discretion as to what shall be a wise and appropriate requirement before any person shall enter that field of activity which is so intimately and vitally related to the public health.
Of course it is necessary in defining such regulations that they shall not be unreasonable, and that they shall operate equally upon all of the same class, or those who are similarly situated.
It matters not that the conditions or qualifications may be rigorous and exacting, the sole question is as to whether or not they are attainable by reasonable study and application. 30 Cyc., 1547 et seq., and cases cited.
In view of all the holdings, by both state and federal courts, as to which there is substantially no exception, it would be a strange doctrine to hold that the constitutional right of liberty or property entitled one as of right to engage in the art of healing, whatsoever his method might be, free from all legislative restrictions.
*315 It has long been a uniform and well-settled doctrine that the right of liberty of contract, growing out of one’s trade, occupation or profession, is not paramount to the right of the public security, morals, safety and welfare.
So that the police power has for its basis, not only the public health, but the right of regulating those occupations or professions which most intimately and vitally affect the public morals, safety and welfare.
The exercise of the police power of the state by the general assembly in the general medical act has been upheld so repeatedly by this court that it is unnecessary to consider this phase of the subject further. France v. State, 57 Ohio St., 1; State v. Gravett, 65 Ohio St., 289, and State v. Marble, 72 Ohio St., 21.
We come now to the Limited Practice Act, passed in 1915, as found in 106 Ohio Laws, 202, beginning with Section 1274-1, General Code. This is the part of the State Medical Act which is specially assailed in this case. If it be constitutional for the general assembly to generally regulate the practice of medicine and surgery in this state, it would seem to follow that it had the same right to regulate any part and to provide in that regulation for a limited practice act.
That is to say, that inasmuch as the whole includes all its necessary parts, what is constitutional as to the whole, would have to be constitutional upon the same ground as to any one of the parts, unless such limited part for other reasons violated some constitutional provision.
*316 Section 1274-1, General Code, reads:
“The state medical board shall also examine and register persons desiring to practice any limited branch or branches of medicine or surgery, and shall establish rules and regulations governing such limited practice. Such limited branches of medicine or surgery shall include chiropractic, naprapathy, spondylotherapy, mechano-therapy, neuropathy, electro-therapy, hydro-therapy, suggestive-therapy, psycho-therapy, magnetic healing, chiropody, Swedish movements, massage, and such other branches of medicine or surgery as the same are defined in section 1286 of the General Code that may now or hereafter exist, except midwifery and osteopathy.”
Section 1274-3, General Code, provides:
“For the purpose of conducting such examination the state medical board shall call to its aid any person or persons of established reputation and known ability in the particular limited branch in which the examination is being held; and in the event that there is in existence a state association or society of practitioners of any such limited branch of medicine or surgery, such association or society, except a state association or society of chiropodists, shall recommend the person or persons to be designated for this service by the board. Any person called by the state medical board to its aid, as provided in this section, shall receive for his services not more than ten dollars per day and his actual and necessary expenses to be fixed and allowed by the state medical board.”
*317 Section 1274-5, General Code, reads:
“The state medical board shall determine the standing of the schools, colleges, institutions or individuals giving instruction in such limited branches. If there shall at any time be such schools, colleges, institutions, or individuals giving instruction in such limited branches, the applicant for such certificate shall, as a condition of admission to the examination, produce a diploma or certificate from such a school, college, institution, or individual in good standing as determined by the board, showing the completion of the required courses of instruction.
“The entrance examiner of the state medical board shall determine the sufficiency of the preliminary education of applicants for such limited certificate as is provided in section 1270 of the General Code; provided, however, that the state medical board may adopt rules defining and establishing for any limited branch of medicine or surgery such preliminary educational requirements, less exacting than those prescribed by said section, as the nature of the case may require.”
The Ohio state medical board has not seen fit to exercise its powers under this section to make “such preliminary educational requirements, less exacting than those prescribed by said section,” as to chiropractors, and no attack is made upon said board by reason thereof, because it is clearly a matter within its discretion. There is in all the so-called learned professions a very decided and salutary tendency to raise rather than lower both the professional qualifications and the preliminary qualifications, ethical *318 and educational, in the interest of the public health and welfare. There should be not only capacity to cure, but conscience in the effecting of the cure and the general treatment of the' patient. The legislature of Ohio has seen fit to adopt a definition of the practice of medicine and surgery, as used in the laws of the state of Ohio. It is best stated in Section 1286, General Code, as follows:
“A person shall be regarded as practicing medicine, surgery or midwifery, within the meaning of this chapter who uses the words or letters, “Dr.”, “Doctor”, “Professor”, “M. D.” “M. B.” or any other title in connection with his name which in any way represents him as engaged in the practice of medicine, surgery or midwifery, in any of its branches, or who examines or diagnoses for a fee or compensation of any kind, or prescribes, advises-, recommends, administers or dispenses for a fee or compensation of any kind, direct or indirect, a drug or medicine, appliance, application, operation or treatment of whatever nature for the cure or relief of a wound, fracture or bodily injury, infirmity or disease. The use of any such words, letters or titles in such connection or under such circumstances as to induce the belief that the person who uses them is engaged in the practice of medicine, surgery or midwifery, shall be prima facie evidence of the intent of such person to represent himself as engaged in the practice of medicine, surgery or midwifery.”
An examination of plaintiff in error’s rather elaborate brief of eighty-nine pages, containing *319 over one hundred citations, discloses the fact that as to the general principles of law therein announced no issue can be taken. We find, however, that for the most part they are inapplicable to the constitutional questions here involved.
At page 77 of the brief is the special head:
"the platt-ellis law is unconstitutional, PER SE, AND ALSO MADE SO BY ITS ILLEGAL ADMINISTRATION BY THE DEFENDANTS.”
Only a page and one-half is devoted to this heading, and the only decision therein referred to holding such an act unconstitutional is the decision of the court of common pleas of Cuyahoga county, granting the injunction in this case, which was set aside by the Cuyahoga county court of, appeals. Elsewhere in the brief there are but two cases dealing with the subject of medical practice. The first is Nelson v. State Board of Health, 108 Ky., 769.
This was a case of osteopathy. The brief does not advise us as to what the form of the statute was in Kentucky, under which the action was brought, and it has no relevancy here.
The supreme court of Kentucky merely held that the statute of that state was not broad enough to include osteopathy, just as the Ohio supreme court held that the old statute was not broad enough to include osteopathy, as decided in State v. Liffring, 61 Ohio St., 39. Both applied the doctrine of ejusdem generis, which was applicable to the then statute, but is wholly inapplicable to the present statute of Ohio.
*320 The only other case dealing with the limited practice of medicine and surgery, cited in support of the contentions of plaintiffs in error, appears in their supplemental brief, a case from Tennessee, Norman v. Hastings et al., a recent decision, rendered December 20, 1920.
The opinion, as disclosed by the supplemental brief, includes the following language as the basis of the judgment:
“Our statutes undertake to provide that no one shall practice any healing art until he has been examined, by our various boards and duly licensed. As a condition to obtain license the applicant must pursue a course of study covering many subjects. Chiropractors have no occasion to apply much of this learning. The court is of opinion that since their treatments are not shown to be injurious to anybody —they do not give medicine, operate or subject the body to injurious manipulation — the requirement that they study and be examined on subjects in no way pertaining to their occupation is an arbitrary and unreasonable attempt to restrict their liberties and the liberty of the people who wish to patronize them. Such a regulation has no reasonable tendency to promote the public safety and welfare.”
We have not been furnished the Tennessee statute, without which it is impossible to properly apply the above language in ■ order to ascertain whether or not it bears any analogy to the Ohio statute. But even if it did, the obvious fundamental fallacies appearing in the opinion, as quoted, clearly show the unreasonableness of the judgment.
*321 The opinion might be resolved into the following syllogism:
MAJOR PREMISE.
Chiropractors have no occasion to apply much of this learning (subjects covered by the statute), because the statutory requirements in no way pertain to their occupation.
MINOR PREMISE.
“The court is of opinion * * * their treatments are not shown to be injurious to anybody, — they do not give medicine, operate or subject the body to injurious manipulation.”
CONCLUSION.
Therefore, the statutory requirements are “an arbitrary and an unreasonable attempt to restrict their liberty and the liberty of the people who wish to patronize them.”
We have already endeavored to point out some of the organic, chemical and other scientific complexities of the human body, the paramount importance of understanding its normal condition to the full, in order to be able to properly diagnose its abnormal ■conditions or diseases, and then to determine upon the proper cure or remedy that will appropriately and adequately cooperate with Dr. Nature in effecting a cure in the great human laboratory. If these subjects are pertinent and essential to those who give many years of study to their profession, it would seem that they should be equally important to those who, having merely a common school educa *322 tion, might get a degree in twelve months and proceed to the practice of medicine under the statute, as is contended for by plaintiffs in error.
A careful and correct diagnosis of the human ill from which the patient is suffering, a study of its condition and its cause, in order the better to properly understand the appropriate cure, may disclose a condition that calls for some affirmative and more or less radical relief in the shape of a surgical operation.
As the body politic is sometimes found to be in possession of undesirables, foreign to our govern.ment and inimical to our public welfare, that require immediate and drastic deportation to other shores, so the physical body is not infrequently found to be in possession of some foreign growth whose immediate removal is indispensable to the health and life of the patient. To say that such knowledge in no way pertains to the treatment of the chiropractor is sheerest nonsense, even to a layman.
Hot and cold applications are ordinarily most efficacious for temporary relief, and very seldom harmful, but merely because they are generally harmless is scarce a reason why they should be resorted to in all cases to furnish relief. The failure to give the natural and necessary relief called for by the condition of the patient, in the shape of some positive or affirmative action by way of treatment, may be as harmful as the giving of a treatment that is harmful per se. What the patient often needs *323 immediately is helpful treatment and not merely harmless treatment. The logic of the opinion in the Tennessee case does not appeal to our judgment.
The saner and more sensible doctrine to the contrary is laid down in a very elaborate and exhaustive opinion of the supreme court of Missouri, in State v. Smith, (233 Mo., 242), 33 L. R. A., N. S., 179. Part of the syllabus in that case follows:
“4: Removing the cause of disease by adjustment of the spinal column under the system termed ‘chiropractic’ is within a statute requiring those who wish to treat the sick to secure a license.
“5: A statute requiring a license as a condition to treating the sick has sufficient relation to the protection of the public health to be within-the police power of the legislature, which cannot be controlled by the courts, and is not so unreasonable or capricious that it can be declared not to be an honest exercise of such power, although it may interfere with the right of the patient to choose his own method of treatment, and of the practitioner to pursue a calling of his choice.”
Judge Ferriss in his opinion, 233 Mo., 258, uses this language:
“Defendant argued that the record shows that he did not ‘treat’ his patients. He calls what he did, not treatment, but adjustment. He says that he does not treat disease; he ‘adjusts the cause.’ Call it what you will the fact remains that the system of practice called in this case ‘chiropractic,’ as explained by defendant’s witnesses and his counsel, involves both diagnosis and physical treatment.
*324 “The patient testified: ‘He laid me down on a cot, and he felt up and down my spine, and he said my spine was in bad condition.’
“The defendant testified: T examined the spine with my fingers, and adjusted the subluxated vertebrae and relieved the impinged nerves.’ ”
And at page 259: “The defendant and his witness testify that they make no diagnosis; take no temperature; do not examine the tongue of the patient, nor any part of the body except the spinal column; that they do not treat the disease, but remove the cause, which is invariably found — no matter what the disease, whether consumption, small-pox, or any other ill that flesh is heir to — located in the spine, and in every case consists of an impingement of the nerves caused by a ‘subluxation’ — whatever that may be — of the vertebrae. Yet, notwithstanding all this, the practice does involve skill, knowledge of anatomy, diagnosis, and physical treatment. * * * When the defendant says that he does not ‘treat’ but ‘adjusts,’ and that he deals not with the ‘disease’ but with the ‘cause,’ he is merely juggling with words. Changing the name does not change the thing.”
The Missouri court then deals with the right of liberty of contract, both of the patient and of the chiropractor, as follows, at page 265:
“Have the people an unrestricted right to determine how they shall be treated ? 2nd. Has a man an unrestricted right to any lawful calling?
“The legislature has the power under the constitution to pass all necessary laws to guard the morals, *325 safety and health of the people, even if such laws in some degree operate as a restraint upon recognized constitutional rights. An absolute right to liberty, or property, or even life itself, does not exist. The state may, and does, deprive its citizens of either of these so-called constitutional rights. When the lawmaking power forbids the manufacture of liquor, an absolute destruction of property results. Yet this may be done, in the exercise of the police power. Our jails and penitentiary are filled with inmates who have been deprived of their liberty for the public good. The power of the State to deprive its citizens of their lives for the public good has never been questioned.”
This very able opinion is full of relevant citations, throwing much light upon the principles herein involved, but it is unwise to review it further, except to close with some of the language near the end of the opinion, at page 268:
“The legislature thought, perhaps, that this act was necessary to protect credulous sick people from injury at the hands of charlatans and quacks, with their specious promises of a sure cure without drugs; or, it may have been thought necessary to forbid harmless practices in order to insure protection against those that are dangerous and hurtful. Sick people sometimes grow desperate in their search for a cure, or their judgment becomes weakened, so that they fall an easy prey to the ingenious and varied devices of the pretended healer. We know that some people are prone to give more weight to a skilfully worded advertisement than to the advice of a competent physician.”
*326 Many more cases to the same general effect may be quoted in support of this doctrine, but the length of the opinion forbids.
Another grievance complained of in the PlattEllis Law is the provision relating to the revocation of the license. Plaintiffs in error are not in position to raise such objection, because they have no license and hence are in no wise injured by any provision relating to the revocation of the license.
Another objection raised is as to the $25 fee being a discrimination, and therefore unconstitutional legislation.
The $25 fee applies to those who take the examination, and no similar fee seems to be charged against those who are given a license by reason of five years’ previous experience and practice.
This classification of five-year practitioners and applicants for examination is not an unreasonable and arbitrary distinction, and falls easily within the principles of classification announced in the late case of City of Xenia v. Schmidt, 101 Ohio St., 437.
Other objections as to the constitutionality, by way of discrimination, do not merit the court’s attention.
We find nothing in the Platt-Ellis Law, as enacted April 27, 1915, violating any provisions of the state or federal constitutions.
An examination of the petition filed in this case, which is of great length, discloses that the chief objection lodged against the defendants lies not so much against the act as against its administration.
The brief of the plaintiffs in error avers the fact to be “That said state medical board have unreason *327 ably, arbitrarily and capriciously refused to approve any of the schools, colleges and institutions giving instructions in chiropractic within the United States, and have not approved any such school, college or institution, although many of the same are in good standing as required by said act of the General Assembly ; that among the leading schools, colleges and institutions of learning giving instruction in chiropractic are the following: The Palmer School of Chiropractic of Davenport, Iowa; the Universal Chiropractic College, Pittsburgh, Pa.; the Ross College of Chiropractic, Fort Wayne, Ind., and the Carver College of Chiropractic, Oklahoma City, Okla., all of said schools, colleges and institutions being not only standard institutions, but the leading institutions teaching chiropractic within the United States.”
The plaintiffs further complain in their petition that the graduates of said schools, holding a diploma and certificate of the same, upon presenting their certificate and diploma to the state medical board, “have from time to time, and uniformly, been informed by said board that they would not be admitted to such examination, and thereupon each and all of said applicants have been denied the privilege of taking the examination, or any examination, so as to evidence their qualifications to receive a certificate from said board entitling them to practice said limited branch known as chiropractic. Plaintiffs, therefore, say that the said State Medical Board have thus unreasonably, arbitrarily and capriciously excluded all of said chiropractors from examination before said board so as to evidence their quali *328 fications to practice chiropractic in the State of Ohio.”
The petition continues, pleading as evidence certain declarations of the secretary of the board as to the general purpose of the board, which is wholly irrelevant in this case.
The petition further complains, by way of discrimination on the part of the medical board:
“By the construction given to Section 1274-1 et seq., of the General Code of Ohio naming certain businesses as limited, branches of medicine and surgery, the said State Medical Board have arbitrarily and capriciously assumed to define and describe said business as follows, to-wit: 'Chiropractic is hereby understood to be the detecting and adjusting by hand only, of vertebral subluxations,’ and have caused said definition to be published and disseminated in and among the rules and regulations adopted by said Ohio State Medical Board under date of January 4th, 1916.”
So far as the petition is quoted in plaintiff in errors’ brief, there is no averment that such definition is unfair, incorrect, or in any wise a misrepresentation of chiropractic, except by the remotest inference, quite insufficient in an application for injunction.
Indeed it is difficult to see how that definition essentially differs from the definition announced to the world through the official catalogue of The Palmer School of Chiropractic, which must be considered as an authoritative definition, the same as if it were in the dictionary:
*329 “Chiropractic (pronounced ki-ro-prak-tik), is the philosophy, science, and art of things natural, and a system of adjusting the subluxated vertebrae of the spinal column by hand, for the restoration of health.”
We must admit that the syllables used in the definition charged against the Ohio state medical board are different from the syllables used by The Palmer School of Chiropractic, but we are clear that there is no essential difference in substance between the two, so far at least as affecting the merits of this case.
We will now consider the major complaint of discrimination on the part of the Ohio state medical board. The facts touching this charge of unreasonable, arbitrary and capricious discrimination against the schools, colleges and institutions of chiropractic were submitted to the court of appeals, whose judgment is here under review.
That court, dealing with the evidence appearing in the record, found squarely against the plaintiffs in error. They found in fact that the schools of chiropractic refused to permit the state medical board to investigate and examine their course of study, equipment, and the efficiency of their training for the students, so far as appropriate under the then Limited Practice Act, as provided in Section 1274 et seq., and especially as required by Section 1270.
For, no matter what the preliminary educational qualifications may be as prescribed by a school of chiropractic, — they may consist of a common *330 school education merely, which as a rule means no educational requirements whatsoever, — still it must be remembered that the general assembly of Ohio has defined by Section 1270, supra, what those qualifications must be to be admitted to the practice of the art of healing in Ohio. The general and professional requirements, not only to enter a school of chiropractic, but to receive a degree from that school, may be the equivalent of the educational requirements defined in the Ohio statutes, but the final decision of that question lies within the discretion of the Ohio state medical board, and is not reviewable, except for gross abuse of that discretion, or a plain violation of the statutes.
Upon the question of discrimination the court of appeals in its opinion says:
“The evidence also discloses that efforts have been made by the State Board of Medical Registration and Examination to investigate these schools. Numerous exhibits are in this record, indicating an apparent reluctance on the part of the schools to be investigated by the State Board, and definite refusals of such investigation, unless the State Board would put itself in an attitude of sympathy with the work of the chiropractic schools.”
It is rather a novel claim to make, that before one can be fair and impartial as to the standing of a school or college he must first put himself in a mental attitude of sympathy with the school. Ordinarily the courts advise juries against all considerations of sympathy in the determination of a fair and impartial verdict.
*331 The record abundantly sustains this finding of the court of appeals, and it might indeed be made much stronger. If there be any need of a sympathetic attitude, it would seem that the schools should put themselves in an attitude pf sympathy toward the Ohio statutes, rather than that the statutes and the administrative boards under them should be put in an attitude of sympathy toward the schools.
We have given unusual research and consideration to the questions herein involved. So far as they have merit we have discussed and decided them. We find nothing of prejudicial error in the judgment of the court below as disclosed by the record. The judgment therefore will be affirmed.

Judgment affirmed.

Marshall, C. J., Johnson, Hoitgii, Robinson, Jones and Matthias, JJ., concur.