Frank MASHAK, Plaintiff-Appellant,

v.

Hon. John H. POELKER, Comptroller, Hon. Raymond R. Tucker, Mayor, Hon. A. J. Cervantes, President of the Board of Aldermen, and as Members of the Board of Estimate and Apportionment of the City of St. Louis, a municipal corporation, Defendants-Respondents.

No. 30913.

St. Louis Court of Appeals. Missouri.

April 17, 1962.

Motion for Rehearing, to Modify Court's Decision or to Transfer to Supreme Court Denied May 21, 1962.

Frank Mashak, pro se.

Thomas J. Neenan, City Counselor, Eugene P. Freeman, Associate City Counselor, St. Louis, for respondents.

BRADY, Commissioner.

In this declaratory judgment action, the pleadings raise the issue of the legality of the establishment of the position of administrative assistant in the juvenile division of the circuit court of the City of St. Louis. The appellant alleges that the statute involved, Section 211.161 RSMo 1959, V.A.M.S., does not authorize the creation of such a position or the employment of a person to fill it, and that the salary paid to the occupant of that position was illegal as exceeding the amount stated in Section 211.-381 RSMo 1959, V.A.M.S., and in Article VIII, § 8, of the Charter of the City of St. Louis. The appellant primarily prayed the trial court to "* * * construe and interpret * * *" the charter of the City of St. Louis, the statutes, and all laws pertaining to the action of the respondents in paying and in authorizing the payment of tax funds for the employment of an administrative assistant to the judge of the juvenile division of the circuit court of the City of St. Louis. The trial court was also requested, if it found the hiring and paying of such a person "* * * to have been illegal and unauthorized by law * *" to require the defendants to repay the city for all such "* * * wrongful and illegal expenditures * * *" or to recover such moneys for the city, and that the respondents be permanently enjoined from continuing the employment and payment of the administrative assistant.

The respondents answered by way of general denial, and also made certain allegations designated as "Matters of Affirmative Defense." The effect of these matters is twofold: first, to place in issue the construction of § 211.161, subd. 3, supra; and second, to allege certain matters which respondents contended assisted the trial court in its construction of the statutes and charter by stating the functions of such an office as created. The effect of the reply was to deny these affirmative allegations. The parties have also filed with the transcript a stipulation signed by respondents' counsel and appellant, a member of the Bar who appears pro se, stating that the transcript of record on appeal inadvertently omitted and is to include the motion of plaintiff-appellant to strike, or in the alternative to make more definite and certain these paragraphs of the "* * * affirmative matters * * *" contained in respondents' answer. A copy of that motion was attached to the stipulation.

The trial court held that the appointment of the office of administrative assistant was authorized by the provisions of § 211.161, subd. 3, supra.

Before proceeding to the merits of this cause, appellant's contention that the trial court prejudicially erred in that it "* * * failed to rule upon his motion * * *" to strike is for our determination. The answer to that contention is that all orders, judgments and decrees issued under the provisions of the declaratory judgment act are reviewed as other orders, judgments and decrees, Section 527.-070 RSMo 1959, V.A.M.S., and we try this action de novo, ruling upon both the law and the evidence, but giving due deference to the findings of the trial court where the credibility of witnesses and the weight of testimony are involved. Montgomery v. Getty, Mo.App., 284 S.W.2d 313. We have authority to exclude that which we determine was improperly included. In this regard, we think the trial court correctly considered the evidence on the matters which the appellant urges us to cast aside for the reason pointed out by the trial court in its memorandum opinion. Therein the court held such matters were pertinent to this controversy, not because whether or not the juvenile division needs an administrative assistant is determinative of its authority under the statute to employ and pay such a person, but because such evidence went to the question of what that person does, and therefore to the question of whether the office of administrative assistant is a "facility" of the court in the sense intended by § 211.161, subd. 3, supra. Accordingly, we find no error in the trial court's action with respect to the appellant's motion.

■■ There are some other preliminary considerations to be disposed of. The transcript disclosed that the plaintiff-appellant is a resident and a taxpayer of the City of St. Louis, who filed as exhibits his tax receipts for six years previous to this trial, which was held on November 22, 1960. Accordingly, he is a proper party plaintiff and can maintain such an action. This specific point was so ruled in the early case of Newmeyer et al. v. Missouri & M. R. Co. et al., 52 Mo. 81, 14 Am.Rep. 394; and the principle therein announced has been followed by our courts since that time, Civic League of St. Louis v. City of St. Louis et al., Mo., 223 S.W. 891; and see Everett v. Clinton County, Mo., 282 S.W.2d 30, at loc. cit. [5, 6] page 35, and cases there cited. There was no contention raised that a declaratory judgment action is not the proper vehicle for such an action, but that question has also been ruled upon by the appellate courts of this state, Berghorn v. Reorganized School District No. 8, Franklin County, 364 Mo. 121, 260 S.W.2d 573, it being equally well settled that both declaratory and coercive relief may be granted in an action brought under the declaratory judgment act, Section 527.080 RSMo 1959, V.A.M.S.; Hudson v. Jones, Mo.App. 278 S.W.2d 799; Montgomery v. Getty, supra.

In view of our disposition of this case, there is no need to set out the evidence fully herein and we will confine ourselves to that which is pertinent to ascertaining the kind or type of work the administrative assistant does, and what his authority is. The defendants-respondents' evidence shows that the administrative assistant is subordinate to the judge of the juvenile division, and the assistant's decisions are reviewed by that judge. The judge of the juvenile division stated that the administrative assistant's duties are to carry out " * * * the judge's policy and he carries out the judge's personnel practices and he sees that the treatment and supervision that the judge adjudicates is carried out in the overall. He doesn't go into each detailed case, of course, because Mr. O'Brien and I confer anywheres from fifteen minutes to an hour a day, and he sees that whatever I want done is done; and he also advises me with reference to the practice in the field." It also appeared that the administrative assistant advised the judge as to the employment of agencies for the alleviation of sociological problems of children. At another point in the transcript this witness testified that the administrative assistant was in charge of the training of juvenile officers and at another place testified that the administrative assistant handles the distribution of the case load among the juvenile officers on the basis of the " * * * ability, the training, the development of the various members of the staff." The judge of the juvenile division of the circuit court of the City of St. Louis testified further to the effect that the creation of the office of administrative assistant was a recommendation contained in a survey and report of the juvenile division prepared by the National Probation and Parole Association, and when asked, "What was the function of such a director of court services—what was the position to entail and represent?" answered,

"Well, for the administration for the whole program under the policies and orders of the court, of a rather large staff over there. We have around thirty juvenile officers and we have supervisors—I don't know how many employees we have. My guess would [be] seventy to eighty. We have personnel problems, we have intake problems, we have problems with the police department, not only your personnel problems—and then your arrangements and agreements with other agencies; we have a great deal to do with Jewish Welfare, Catholic Charities, Family Service, problems with reference to community policies * * * as I say, personnel, employment of personnel, recruitment of personnel—getting up the budget.

"Q. Training personnel?

"A. And training programs, continuous education programs. Then you have a problem of building maintenance, cleanliness, housekeeping problems, telephone service—* * *."

Following this testimony, the witness continued his discussion of the problems inherent in the administration of the juvenile court, and concluded by stating,

"* * * As a matter of fact, in my opinion, it would be absolutely impossible for the juvenile judge to conduct a juvenile court without an administrator who knows the operation of the court * * * human dynamics, how to handle personnel, how to administer, how to assign cases, how to acquire court reports, how to evaluate cases."

It further appeared from the testimony of this witness that the administrative assistant had established operating procedures for every phase of the juvenile court's work; had provided standards as to what the juvenile's investigative file should contain before it is placed before the court for its guidance and information, and also how such material should be organized; and had established "intake policies" dealing with the broad rules as to

"* * * whether a case should be accepted by the court or whether it can be handled in the police department or whether it can be handled by a private agency or whether it should be referred to the field division, whether it can be disposed of with a conference, with the parents, whether a petition should be filed."

The administrative assistant had also instituted staff training and recruitment programs and had taken the burden of supervisory control of the juvenile officers from the juvenile judge.

The witnesses Reardon, Claeys, and Hugge, deputy juvenile officers, all testified as to what their work entailed but gave no testimony as to what the functions of the administrative assistant were.

The witness Gorman testified she was the chief deputy juvenile officer, and described her duties before and after the appointment of the administrative assistant, but gave no testimony as to what that person's duties were except that he gave orders to her which resulted in substantial curtailment of her authority and which indicated his control over all phases of the work done by juvenile court employees.

The witness Harmon testified that he was employed by the Health Division of the City of St. Louis as Chief Social Worker for the Child Guidance Section and that his duties were as follows:

"Well, I have—I mean my job is to take care of the statistic reports of all four of the clinics; to coordinate the intake, that is, the total number of children brought into all of the clinics; to supervise the three social workers who are in charge of three of the clinics. I also supervise two field work students and a case worker, two case workers."

He testified that the administrative assistant had nothing personally to do with the aspect of the clinic he was concerned with, but that the administrative assistant had attended a meeting "* * * to discuss the possibility of having one person handle the referrals from the court to our clinic so that individual juvenile officers would know the status of their own cases, that is, more of a liaison person. I recall this was discussed with him at a meeting that I attended."

The witness Reynolds, a psychiatrist, employed by the Health Division of the City of St. Louis, testified that he directed the Juvenile Court Branch Clinic operated by the Health Department, and when asked what the administrative assistant does at the clinic, answered

"I think, in brief, the internal administration of the clinic I handle. The

matters having to do with the relationship of the clinic to the court, the types of service to be provided by the clinic to the court, I consider a sort of external control or administration, and this is handled by Mr. O'Brien."

In the testimony given by the witness Lewis, it appeared that the travel expenses " * * * or anything of that sort * * *" for the employees of the juvenile court were approved by the administrative assistant.

■■ We are adjured to a liberal construction of the various sections of the Juvenile Code by Section 211.011 RSMo 1959, V.A.M.S., and are to read and construe § 211.161, supra, in the light of the other sections of the complete law or code of which it is a part, In the Interest of Ronald C———, Mo.App., 314 S.W.2d 756. Our primary duty, however, in construing a statute of this state is to ascertain the legislative intent from the very words used, if possible, and to put on the statutory language its plain and rational meaning, having in mind the object of the enactment.

The intention of the legislature in passing this section of our statutes is so clear from a reading thereof that we will abandon our practice of not setting out the statute in the opinion. It reads:

"§ 211.161. *Court may require physical or mental examination of child— costs paid by county.*

"1. The court may cause any child within its jurisdiction to be examined by a physician, psychiatrist or psychologist appointed by the court in order that the condition of the child may be given consideration in the disposition of his case. The expenses of the examination when approved by the court shall be paid by the county.

"2. The services of a state, county or municipally maintained hospital, institution, or phychiatric or health clinic may be used for the purpose of this examination and treatment.

"3. A county may establish medical, psychiatric and other facilities, upon request of the juvenile court, to provide proper services for the court in the diagnosis and treatment of children coming before it and these facilities shall be under the administration and control of the juvenile court. The juvenile court may appoint and fix the compensation of such professional and other personnel as it deems necessary to provide the court proper diagnostic, clinical and treatment services for children under its jurisdiction."

The first subsection of that section gives the juvenile court the authority to have a child within its jurisdiction examined by a physician, psychiatrist or psychologist, and to compel the payment by the county for such an examination. The second subsection thereof grants the court authority, if it sees fit to do so, to use state, county or municipal hospitals, institutions, or psychiatric or health clinics for the purpose of this examination.

The third subsection is divided into two sentences. The first gives authority to the juvenile court to request the establishment of " * * * medical, psychiatric and other facilities * * *" by a county, and also provides for " * * * these facilities * * *" to be under "the administration and control of the juvenile court * * *" if they are established. The purpose of the legislature was clearly to provide a means whereby those counties in this state that did not have such facilities at the passage of this section, or wherein it was determined to be inadvisable to use such existing facilities, could establish such facilities of their own if the juvenile court saw fit to request them and the county authorities agreed. By the use of the word "may" in this sentence and in subsection 2, the legislature also recognized that even though there may be a state, county or municipally maintained hospital, institution, or psychi-

atric or health clinic within the county, the county may nevertheless see fit to establish its own facilities of this nature for the diagnosis and treatment of children.

■ The very provisions of the first subsection lead irresistibly to the conclusion that the "other facilities" referred to in the first sentence of subsection 3 of this section were those that were to be used in the medical, psychiatric or psychological examination which the court was given authority to order by the provisions of the first subsection. The wording of the second subsection is likewise compelling that what the legislature intended by the use of the words, "other facilities", in the third subsection were those enumerated in the second subsection: that is, hospitals, institutions, or psychiatric or health clinics.

■ Not only does the organization of the section compel such a result, but the very language used requires the same conclusion. Words in a statute are to be construed in their normal and usual meaning and usage. We are cited by the respondents to State ex rel. Knight v. Cave, a case by the Supreme Court of Montana in 1897, reported in 20 Mont. 468, 52 P. 200, wherein that court held that a teacher in a school could be considered a facility. We have searched for similar holdings in this state and we have found none. Moreover, Webster's New International Dictionary, 3rd Edition, gives no indication that the word "facility" is used to refer to a person. The definitions of that word as found in that source refer to it as a quality, such as the quality of being easily performed or of affability or graciousness, or as being "something that promotes the ease of any action, operation, transaction or course of conduct", or as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." To say that the legislature, in view of the definition stated herein of the word, "facility", and the rule that we are to construe the words

used in the statute in their normal and usual sense and usage, intended the word "facility" to include a person would amount to judicial legislation, in which, regardless of how much we may be in agreement with the desirability of the employment of a person such as here involved, we cannot indulge.

■ The application of the rule of ejusdem generis compels the same result. While this court has held, State ex rel. Schneider's Credit Jewelers v. Brackman, Mo.App., 260 S.W.2d 800, at loc. cit. [11, 12] page 813 (reversed on other grounds, Mo.App., 272 S.W.2d 289) that this rule is not to be used to nullify the plain intent of the legislature, it is likewise clear that the aid to construction of a statute which the rule provides may be used to help ascertain that intention. The rule of ejusdem generis is a familiar rule of construction that where general words follow the enumeration of particular classes or things the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. See Missouri Digest, Statutes, ☞194. In accordance with that rule of construction, the words "other" or "any other" following an enumeration of particular classes are to be read as "other such like" and to include only others of like kind or character. See State v. Eckhardt, 232 Mo. 49 (133 S.W. 321) at page 52 of the report of that opinion in 232 Mo. In the instant case, the application of the rule of ejusdem generis would require the "other facilities" as those words are used in paragraph 3, § 211.161, supra, to mean other facilities like medical and psychiatric facilities.

The respondents urge that the terms "medical" and "psychiatric" are terms which exhaust their separate classes, and therefore the phrase "other facilities" must be construed to intend something at variance with the facilities relating to the terms, "medical" and "psychiatric." If the terms, "medical" and "psychiatric" are specific terms which exhaust their class, or de-

note things greatly different from each other, then the respondents' position has merit. This application of the rule is recognized in our case law. In State v. Eckhardt, supra, at loc. cit. page 52 of 232 Mo. of the official report, at page 321 of 133 S.W., the court held:

"The rule is based on the obvious reason that, if Legislature had intended the general words to be used in their unrestricted sense, they would have made no mention of the particular classes. The words 'other' or 'any other,' following an enumeration of particular classes, are therefore to be read as 'other such like,' and to include only others *of like kind or character*. The doctrine of *ejusdem generis*, however, is only a rule of construction to be applied as an aid to ascertaining the legislative intent, and does not control where it clearly appears from the statute as a whole that no such limitation was intended. *Nor does the doctrine apply where the specific words of a statute signify subjects greatly different from one another; nor where the specific words embrace all objects of their class, so that the general words must bear a different meaning from the specific words or be meaningless.'* 36 Cyc. pp. 1119–1122. This definition fairly and clearly explains the meaning, purpose manner of applying, and limitations of the doctrine invoked." (Emphases supplied.)

We cannot agree with the respondents' contention that the words, "medical" and "psychiatric" are words which describe quite different things and which totally exhaust their class. Webster's New International Dictionary, 3rd Edition, defines "medical" as "of, relating to, or concerned with physicians or with the practice of medicine * * *." That same work defines "psychiatric" as "relating to, employed in, or of concern to psychiatry" and defines "psychiatry" as "a branch of medicine that deals with the science and practice of treating mental, emotional and behavioral disorders * * *." Clearly "medical" and "psychiatric" do not denote subjects greatly different from each other, but do in fact refer to those that are connected with each other. Neither does each embrace all the objects of the class; one, by the definitions above quoted, being a specialty, branch, or division of the other.

As has been stated earlier herein, the juvenile code of this state is a complete law, and therefore each section is to be read and construed in the light of the other sections thereof, In the Interest of Ronald C————, supra. A reference to other sections of the comprehensive code of which § 211.161, supra, is a part compels the same result. Had the legislature intended to provide for the employment of an administrative assistant, or a person, regardless of the designation that might be given him, serving under the authority and direction of the juvenile judge but having general supervisory and administrative control over the other employees and functions of the juvenile court, it would certainly have provided for the establishment of such an office, and his compensation, in Section 211.381 RSMo 1959, V.A.M.S., wherein "the employees of the juvenile court" in the City of St. Louis and other counties of the first class and their compensation is provided. The statute is detailed and includes juvenile officer, chief deputy juvenile officer, deputy juvenile officers, secretaries and stenographers, and clerks and typists. Any statute which is that inclusive certainly would have included such an important office as administrative assistant, had one been contemplated by the legislature when enacting the juvenile code. The auxiliary rule of statutory construction of expressio unius est exclusio alterius would be applicable if needed to help us ascertain the intention of the legislature.

The second sentence of § 211.161, subsection 3, supra, provides the juvenile court with authority to "appoint and fix the compensation of such professional and other

personnel * * *" as it deems necessary to provide the court with proper diagnostic, clinical and treatment services. The reference therein to "* * * such professional * * *" must be read with the previously discussed provisions of subsection 1 clearly in mind, and was intended to refer to the professional people therein named, a physician, psychiatrist or psychologist. By the words, "other personnel", the legislature clearly had in mind someone different from such professional people, and that term must be read with the provisions of the first sentence of subsection 3 with reference to placing with the juvenile court the "* * * administration and control * * *" of the hospital institution, psychiatric or health clinic which the county may establish if its governing body and the juvenile judge see fit to so do. Being cognizant of that provision and being aware, as men of experience in the establishment and administration of such hospitals, institutions, or psychiatric or health clinics on a state level, that such cannot be properly or effectively administered or controlled without other personnel than those actively engaged in the diagnosis and treatment on a professional level, the legislature intended by the words "* * * other personnel * *" to provide for the employment and compensation of the auxiliary personnel that would be necessary should such a facility be established. For example, the legislature certainly must be held to have knowledge of the need for accurate case records, for cleanliness, and for orderly or nursing assistants. Such wording was placed in this section to provide for the employment and compensation of secretaries, janitors, nurses and orderlies and such "* * * other personnel * * *" necessary, although auxiliary, to the functioning of the hospital, institution, or psychiatric or health clinic. Wisely realizing that different situations would call for different types and numbers of "* * * other personnel * * *" the legislature did not attempt to specify the number or classification of such "* * * other per-

sonnel * * *" but left those matters within the discretion of the juvenile court, providing only that these "* * * other personnel * * *" be deemed by the juvenile court necessary to provide it with proper diagnostic, clinical and treatment services for the children under its jurisdiction.

Again mindful of our duty to construe this section, keeping in mind the other sections of the Code of which it is a part, this construction of the last sentence of § 211.-161, subsection 3, supra, is in keeping with the provisions of § 211.381, supra. Certainly the legislature would not, in § 211.381, supra, when classifying and fixing the compensation of juvenile court employees, leave out of that section the professional and other personnel which it gave authority to the juvenile court to appoint and fix compensation for, had it not intended that the professional and other personnel therein named would be in addition to, or other than, those stated in § 211.381, supra, and were not to be bound by the rates of compensation stated therein. The legislature realized that those within the terms "* * * such professional and other personnel * * *" used in § 211.161, subsection 3, supra, would not really be employees of the juvenile court as that term is used in § 211.381, supra, but would be employees of a medical, psychiatric or other such like facility which would be under the administration and control of the juvenile court.

■ The result to which we are compelled by the language of the statute itself as buttressed by the auxiliary rules of construction of expressio unius est exclusio alterius and ejusdem generis is that the intention of the legislature in enacting this section was, first, to provide the juvenile court with authority to order physical, psychiatric and psychological examinations of children under its jurisdiction; second, to allow the use of presently existing state, county, or municipal hospitals, institutions, and psychiatric or health clinics for that purpose in those counties where such ex-

ist; and third, to provide authorization for a county wherein it was decided not to use presently existing facilities or wherein no state, county, or municipal hospital, institution, or psychiatric or health clinic is located to establish, under the administration and control of the juvenile court, a county hospital, institution or psychiatric or health clinic for the purpose of medical, psychiatric or psychological diagnosis and treatment of children coming before the court; further, to provide for the staffing of such a place, if it is to be established, not only with professional medical, psychiatric, and psychological professionals, but also with the auxiliary personnel which, under the circumstances surrounding the establishment of the facility in that county, the juvenile court deems necessary to provide the children sent to that place by the court with proper diagnostic, clinical and treatment services.

 What we have said above disposes of the contention that the words, " * * * other facilities * * *", as used in § 211.-161, subsection 3, supra, would authorize the employment of the administrative assistant here involved adversely to the respondents. While we can conceive of a situation where the last sentence of § 211.-161, subsection 3, supra, as herein construed would authorize the employment of such a person, the facts of the instant case compel the opposite result. The evidence clearly indicates that the administrative assistant in this case was never hired for, nor was his authority and work ever intended to be limited merely to the administration and control of the medical, psychiatric or psychological or health clinic which the juvenile division of the circuit court of the City of St. Louis used in the diagnostic, clinical and treatment services for children under its jurisdiction. In the instant case, the evidence is clear, and largely provided by the respondents' own witnesses, that the duties of the employee here involved went far beyond such a restriction. Only one witness gave any testimony from which we can find any foundation to support the work

of an administrative assistant in such fields—that was the witness Youngdahl, whose testimony on the point is summarized earlier in this opinion. But even his testimony is lacking any specific reference to this employee's activities. In fact, the witness was asked, "What are the functions * * *" of the office generally, and his answer went to what the functions, duties and responsibilities of a "Director of Social Services" or "Administrative Assistant" should be and would be, as he understood the office. Nowhere did he relate what this specific administrative assistant did. This testimony then immediately follows his general summary of what the position should and would entail as he understood it:

"Q. Would it be fair to say this, Dean, that the person in such a position provides a professional skill on a management—of the internal management of the staff of the court, and provides a professional skill to the court in the utilizing of external agencies and external means for the treatment and care of children?"

"A. That would be a correct statement, in my opinion."

THE COURT: "Well, does he assist in the administration of diagnosis and treatment?"

THE WITNESS: "He facilitates it. He has staff meetings. If he has a very difficult case, he might call the people together and say, 'Let's have a common discussion.'"

THE COURT: "In getting together and formulating proposed procedures—"

THE WITNESS: "I would say—"

THE COURT: "Conferring with the judge and recommendations to the judge to adopt or reject them?"

THE WITNESS: "Right."

THE COURT: "Overseeing the person under his charge, is he engaged in diagnosis or treatment?"

THE WITNESS: "I'd say."

THE COURT: "Is that one aspect?"

THE WITNESS: "You can't have diagnosis within which to administer that, the same way as treatment. I would say definitely he is."

It is clear that the answer of the witness that such a person was engaged in diagnosis and treatment was not based upon what this particular administrative assistant did, but rather was based upon what an administrative assistant would do as the witness understood the office. Neither is there testimony elsewhere in the transcript to the effect that this employee did all the things which Youngdahl enumerated in his general review of the functions of an administrative assistant. In fact, all the other evidence is that he did not do those things specifically related to the diagnosis, clinical and treatment services connected with medical, psychiatric or psychological examination. The whole effect of the testimony on the point is that this employee's duties were in the main concerned with the training and supervision of the juvenile officer personnel, with the correlation of the court's activities with the various agencies and other organizations who work in the same general field, and with procedural matters. These duties covered every phase of the activities of the juvenile court. Accordingly, the factual situation disclosed by this transcript would not sustain the employment of this administrative assistant, hired as he was to do general supervisory work over all the personnel in the juvenile court office, not just those engaged in the hospital, institution, psychiatric, or health clinic used by this court. We are compelled to hold that the employment of this administrative assistant was not authorized by the provisions of § 211.161, supra, and it follows that the respondents should be enjoined from continuing the employment and payment of the administrative assistant.

The petition also prayed that the respondents be compelled to repay to the city any wrongful and illegal expenditures or, in the alternative, that they be directed to recover such moneys for the city. In consideration of these matters, it first should be pointed out that while the petition states the official position each of the respondents individually holds, the whole sense of the petition is that appellant proceeds against the respondents as a Board. The charter of the City of St. Louis was not introduced into evidence, but we are required to take judicial notice of the provisions thereof. See Missouri Digest, Evidence ☞31. Article XVI of the Charter provides for the Board of Estimate and Apportionment. There is no question here involved concerning the requirements of that Article with respect to a statement of comparative receipts and expenditures, and therefore we will not herein concern ourselves with those provisions. Insofar as the questions raised herein are concerned, § 1 of that Article creates the Board and provides for a record to be kept of its proceedings. Section 2 of that Article requires the head of the various branches of the city government to furnish to the Board what amounts to a statement of the monetary requirements for the coming fiscal year. Section 3 of that Article provides that the Board is to submit to the Board of Aldermen what amounts to a consolidated statement showing the requirements for all the departments and further provides that the taxpayer shall be given an opportunity to be heard in a manner provided by ordinance. There is no contention but what the appellant was given this opportunity to be heard and that he did appear before the Board to contest the expenditure with which we are here concerned. The second paragraph of § 3 of Article XVI of the charter provides, among other things, that the Board is to " * * * annually submit and recommend to the Board of Aldermen a bill appropriating the amounts deemed necessary * * * for that fiscal year for all departments. * * *" That same paragraph later provides therein that the Board of Aldermen may reduce the amount

of any item in this bill except for certain amounts which are fixed by statute, or for certain other amounts with which we are not concerned in the instant case, but that the aldermen may not increase the amount in the bill nor insert new items. The other sections of that Article are not pertinent to the inquiry required by this appeal.

Under the provisions of Article XVI, the Board of Estimate and Apportionment is required to act as a sort of clearing house for the budgetary requirements of the various phases of government with which it is concerned. Its purpose is to consider the budget requests as they are submitted to it, and to include those amounts which in the exercise of its discretion are deemed necessary to the proper function of each department in a bill which it recommends to the Board of Aldermen. It has a sort of veto power in the respect that the Board has no authority to increase the amounts recommended by the Board of Estimate and Apportionment, nor to insert new items. However, § 3 of Article XVI specifically provides that insofar as items with which we are here interested are concerned, the Board of Aldermen may reduce the amount contained in the bill recommended by the Board of Estimate and Apportionment.

It is obvious that any action the Board might direct to be taken to recover these moneys must be brought in the name of the City, for these were city funds that the appellant alleges were illegally paid. Nowhere in Article XVI is the Board granted any authority to direct an action to be brought in the name of the City. We cannot compel the respondents to take action to direct the recovery of such moneys when they would not be authorized by the charter to comply with our order. In any event, the principles of unjust enrichment govern the recovery of unauthorized or illegal payment of such moneys. City of St. Louis v. Whitley, Mo., 283 S.W.2d 490, at l. c. [6] page 493. The application of those principles would seem difficult to justify in the face of this record disclosing the valuable services which the administrative assistant has rendered to the city. It is obvious that these services cannot be returned, and to allow the city to retain the value of these services and at the same time recover the money paid for them would seem to violate the elementary principles upon which such recoveries are based. However, we do not rule that point.

With respect to the prayer that this money be recovered from the respondents, there is no allegation in the petition nor is there any proof that the respondents, as a Board, directed the payment. In the same paragraph of the petition wherein the appellant alleges that the Board " * * * approved and appropriated * * *" these moneys, appellant follows that allegation with an allegation that the respondents' action " * * * was later approved by the Board of Aldermen which *authorized* * * *" payment (emphasis supplied). It is obvious from the pleadings, from the proof, and from the provisions of Article XVI of the charter, that the respondents as a Board merely recommended the appropriation of these moneys. Under these facts the respondents can not be held liable as a Board. Theirs was not the final determinative or decisive action, but was merely a recommendation. The actual act of authorizing the payment of these moneys and appropriating funds therefor was that of the legislative body of the city, the Board of Aldermen, by the passage of the ordinances introduced into the record.

The judgment should be reversed and the cause remanded with directions to the trial court that a judgment be entered declaring that there is no authority under the provisions of § 211.161, supra, for the employment of an administrative assistant doing the work which this record shows that employee to do in the instant case. The trial court should further be directed to issue its injunction against the continued employment and payment of such person. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is therefore reversed, and the cause remanded with directions to the trial court that a judgment be entered declaring that there is no authority under the provisions of Section 211.161 RSMo 1959, V.A.M.S., for the employment of an administrative assistant doing the work which this record shows that employee to do in the instant case. The trial court is further directed to issue its injunction against the continued employment and payment of such person.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.