**Frank MASHAK, Appellant,**

v.

**John H. POELKER, Comptroller, Raymond R. Tucker, Mayor, A. J. Cervantes, President of the Board of Aldermen, and as Member of the Board of Estimate and Apportionment of the City of St. Louis, Missouri, a Municipal Corporation, Respondents.**

No. 49593.

Supreme Court of Missouri,

En Banc.

May 13, 1963.

Frank Mashak, pro se.

Thos. J. Neenan, City Counselor, Eugene P. Freeman, Associate City Counselor, St. Louis, for defendants-respondents.

Laura Andreas, Harold S. Cook, Fred A. Eppenberger, Echeal T. Feinstein, St. Louis, for Bar Ass'n of St. Louis, amicus curiae.

STORCKMAN, Judge.

This is a declaratory judgment action in which the plaintiff attacks the validity of the employment of an administrative assistant for the judge of the juvenile division of the Circuit Court of the City of St. Louis. All of the regular circuit judges having disqualified themselves, the Honorable Sam C. Blair presiding as a special judge found the issues against the plaintiff and held the creation of the position to be lawfully authorized. The plaintiff appealed and the

St. Louis Court of Appeals reversed the judgment of the circuit court and remanded the cause with directions to enter a judgment declaring the establishment of the position to be unauthorized by the state's statutes. The opinion is reported in 356 S.W.2d 713. On the application of both parties, this court ordered the appeal transferred from the court of appeals. Among other things, the validity of the appointment of the administrative assistant depends upon the legislative authority conferred by Chapter 211, RSMo 1959, V.A.M.S.

The words of a statute must be given their ordinary meaning, but in case of ambiguity a statute must be construed in the light of the evil it seeks to remedy and, if necessary, the circumstances and conditions existing at the time of its enactment may be considered in order to promote the purpose and objects of the statute. St. Louis Southwestern Ry. Co. v. Loeb, Mo., 318 S.W.2d 246, 252[1]; Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S.W.2d 77, 82[9]. Since the case was tried without a jury, the trial court properly allowed the parties wide latitude in the admission of evidence. Much of the evidence adduced is of no benefit in ascertaining the legislative intent and the powers of the City and the circuit court in executing its functions as a juvenile court. To the extent that the evidence is material, it will be considered and the immaterial will be disregarded.

Under § 211.411, subd. 3, RSMo 1959, V.A.M.S., a juvenile court "is authorized to seek the cooperation of all societies and organizations having for their object the protection or aid of children and of any person or organization interested in the welfare of children." At the request of the judges of the Circuit Court of the City of St. Louis and the St. Louis Board of Public Service, the National Probation and Parole Association made a study of the juvenile court and selected related agencies in the City of St. Louis. The field work and preparation of the report of the study required thirty-nine weeks of time beginning in September 1956. The report consisting of 200 pages, exclusive of appendices, was filed in April 1957. The report, introduced in evidence as defendants' Exhibit 3, is quite exhaustive, but we are primarily concerned with the Survey's recommendation to establish a position referred to in the report as the Director of Court Services. The recommendation was accepted along with others relating to a comprehensive reorganization of the services of the juvenile court, but the name of the position was changed to Administrative Assistant to the Juvenile Court Judge.

The report at page 64 describes the duties of the office as follows:

"*THE DIRECTOR OF COURT SERVICES* While ultimate responsibility for administration rests with the judge of the division, he obviously cannot and should not attempt the day to day administration of the probation department and detention home. To execute policy established by the judge of the division and judges in General Term, a director of court services is recommended. The director of court services should be responsible for the administration of the probation department and the detention home. * * *.

"Duties and authority should be clearly defined for each position in the department so that each staff member will know exactly what he is responsible for and to whom. The department director should be responsible for selection of staff under him (from lists certified by the citizens advisory committee), recommend policies for consideration by the judge, develop an agency manual, assign duties, promote a staff development program, develop inter-agency agreements in cooperation with the advisory committee and the judge, develop an adequate administrative reporting program, prepare annual reports, and handle public relations."

Judge David A. McMullan, one of the eighteen circuit judges of the City of St. Louis, was assigned to the juvenile division

in the fall of 1957 and has served there since that time. He testified in substance that the circuit judges in general term recommended that the survey be made by the National Probation and Parole Association and he described the manner in which it was made and the various persons, committees, and organizations that took part in it. He estimated that the juvenile division had 70 to 80 employees of various kinds and had over 5,000 referrals a year. In 1959 the juvenile court had over 1,700 cases on its docket including neglect, delinquency, transfer of custody, and adoption cases. There were problems connected with assigning cases for investigation and report so as to use the best abilities of the juvenile officers. Also there was a lack of coordination between the field department and the detention home. In Judge McMullan's opinion, it was impossible for the juvenile judge to properly conduct the court without an administrator who knows the operation of the court, how to handle personnel, how to administer, how to assign cases, how to acquire court reports and evaluate cases, and how to utilize various private and charitable organizations which perform services in connection with the care and maintenance of children. On the recommendation of the circuit judges in general term, the position of administrator was established; they adopted a job description, established the qualifications of the office, and fixed the salary at $12,000 maximum. The City approved the recommendation and made the funds available. Among the qualifications for the position was a Master's Degree from an accredited school of social work and at least five years' administrative experience. The existence of the position was widely advertised and there were about sixteen applicants. Mr. John P. O'Brien of Grand Rapids, Michigan, was ultimately appointed to the office and he went to work on January 1, 1959.

Judge McMullan further testified that the administrator is directly responsible to the juvenile court judge, that he carries out the judge's policy and personnel practices and sees that the treatment and supervision adjudicated by the judge is carried out. It is the administrator's duty to see that the various investigations and examinations are completed and that proper reports and recommendations are provided for the information of the judge. These include medical, psychiatric, and psychological examinations where required. Judge McMullan described in considerable detail the lack of coordination and effectiveness existing before the position of administrative assistant was established and also the improvement resulting therefrom, but the foregoing sufficiently indicates the import of his testimony.

Dr. Benjamin E. Youngdahl, Dean of the George Warren Brown School of Social Work at Washington University, testified in substance that the modern role of juvenile courts is to diagnose and treat the causative factors in child problems rather than to adjudicate guilt or innocence and to apply punishment; that such courts have widely adopted the use of professional services of sociologists and social workers to accomplish such purposes; that sociological skill undertakes to diagnose the problem of the child and determine the proper treatment and in so doing uses other professions and sciences, such as medicine and psychiatry, and other existing methods, institutions, and facilities for the welfare of children; and that a professionally trained sociologist can assist the court in carrying on its administrative services in this kind of structure by training and directing the staff in making proper diagnosis and recommendations and in carrying out the plan of treatment ordered by the court.

Kenneth R. Foresman, the Executive Director of Boys' Town of Missouri, testified that he was a member of the staff study in connection with the report of the National Probation and Parole Association, and that he testified before a legislative committee in connection with the enactment of Chapter 211 (Laws 1957, p. 642, approved June 13, 1957). He described what he considered a considerable improvement in the

professional work of the staff of the juvenile court since the position of administrative assistant was established.

In addition to evidence of a formal nature regarding his right to maintain the suit, the plaintiff called three circuit judges who had served as judge of the juvenile court prior to Judge McMullan's tenure. One of them testified he had drafted a twelve-point program for the improvement of juvenile court services, one point of which was the employment of a director of court services equivalent to an administrative assistant to a full-time judge. The plaintiff also called as witnesses the chief juvenile officer and eight deputy juvenile officers who testified with respect to their duties before and after the establishment of the position of administrative assistant. He also put on the stand a psychologist formerly employed by the City, a psychiatrist presently employed in the Health Division of the City, and two social workers employed by the City. The testimony of these juvenile court and City employees tended to show that the City had provided medical, psychiatric, psychological, and social services prior to the employment of Mr. O'Brien and tended to minimize the effectiveness of the services of the administrative assistant. Other evidence was calculated to show doubt on the part of City officials as to their authority to employ an administrative assistant.

The plaintiff has his contentions on appeal divided into eighteen points. Several of them are overlapping and others are but parts of other contentions. One point is that the trial court erred in failing to rule on plaintiff's motion to strike or, in the alternative, to make parts of defendants' answer more definite and certain. There is no showing that the motion was presented to the court and the matter was not pursued or referred to in any manner at the trial. There is no showing of prejudice. There is nothing preserved for our review.

The plaintiff contends there is no legislative authority for the establishment of the position in question. The defendants contend that they are authorized by the statutes, Chapter 211, and further that the circuit court under its inherent power is authorized to do all things reasonably necessary to preserve its existence and function as a court. We will consider the statutory power first.

Section 211.161 RSMo 1959, V.A.M.S., consists of three subdivisions. The first authorizes the court to cause a child within its jurisdiction to be examined by a physcian, psychiatrist, or psychologist appointed by the court "in order that the condition of the child may be given consideration in the disposition of his case." The second subdivision authorizes the use of the services of a state, county, or municipally maintained hospital, institution, or psychiatrist or health clinic "for the purpose of this examination and treatment." The third subdivision of § 211.161 and the one with which we are more particularly concerned reads as follows: "A county may establish medical, psychiatric and *other facilities,* upon request of the juvenile court, to provide proper services for the court in the diagnosis and treatment of children coming before it and these facilities shall be under the administration and control of the juvenile court. The juvenile court may appoint and fix the compensation of such professional and other personnel as it deems necessary to provide the court proper diagnostic, clinical and treatment services for children under its jurisdiction." *Italics supplied.* The defendants contend that the position of administrative assistant comes within the purview of the term "other facilities" and that the juvenile court is authorized to make the appointment in question.

The plaintiff contends that the trial court erred in holding that the employment of an administrative assistant to the judge of the juvenile court was authorized by the term "other facilities" appearing in § 211.161, subd. 3, because the word as used in the context of the statute does not mean a person but instead denotes inanimate rather than human agencies. In support of his contention the plaintiff cites Sloss-Sheffield Steel & Iron Co. v. Smith, 185 Ala. 607, 64

So. 337, 338, which is a suit for personal injuries wherein the plaintiff was struck by a plank and injured while working on a trestle. The plaintiff alleged a failure to furnish a sufficient number of competent and skilled workmen. In support of its plea of contributory negligence the defendant alleged that it was the plaintiff's duty as superintendent of construction to see that proper facilities, ropes and appliances, were used. The Supreme Court of Alabama held that the plea of contributory negligence was not responsive because the "word 'facilities,' in this connection, means convenient means, and ordinarily includes inanimate means rather than human agencies."

The term "facilities" is not as limited as the plaintiff contends. In the case of State ex rel. Knight v. Cave, 20 Mont. 468, 52 P. 200, 203, the question involved was whether school teachers were within the meaning of a statute which authorized a special tax "to purchase lots and furnish additional school facilities". The question was whether teachers' salaries could be paid out of a fund derived from a special tax when other funds had been exhausted. Other statutes made general provision for the support and maintenance of schools including the employment and payment of teachers. Nevertheless the Supreme Court of Montana held that teachers and their services were within the meaning of the phrase "additional school facilities", stating 52 P. 203: "It is admitted that the tax was levied and collected to furnish 'additional school facilities.' To provide, when reasonably necessary or convenient, more school rooms, is to furnish additional school facilities. 'Facility' is not a technical word, but one in common use, and its meaning is to be found in the sense attached to it by approved usage. * * * Roget's Thesaurus gives 'aid,' 'assistance,' and 'help' as equivalents of 'facility.' Webster, among other definitions of the word, includes 'the quality of being easily performed; ease in performance; that which promotes the ease of any action; advantage; valuable aid; assistance.' The Century Dictionary follows the definitions of Webster, and adds 'the means by which the performance of anything is rendered more easy; convenience.' That which aids, assists, or makes more easy the acquisition of knowledge is a convenience and an advantage, and is clearly a 'facility.' Books, maps, globes, and charts are facilities to the imparting of knowledge. Through them or by means of them information is conveyed to the pupil. But the meaning of the word is not limited to inanimate bodies or things. Men are often facilities. Without a crew to man his vessel, the master of a ship would not have the necessary facilities. A school with a complement of pupils in every room, but lacking teachers, would certainly not have the facilities to carry on educational work. The question so frequently put, as to whether the school facilities of a certain city or town are good, is an inquiry which at once suggests the teachers, their sufficiency in number and their ability to impart knowledge. Parents often remove their families to a place with good school or educational facilities, the chief reason actuating them being the quality of the teachers, and not the mere inanimate advantages. Can it be fairly claimed that a district equipped with all necessities and conveniences in respect of buildings and appliances and apparatus for teaching, but lacking adequate instructors, has sufficient school facilities? The labor performed by the teacher is assistance and valuable aid. It renders the acquisition of knowledge by the pupils more easy, and is a facility. Teachers are means of imparting knowledge to pupils, and are therefore educational facilities. We are inclined to the opinion that the legislature intended to include teachers and their services within the meaning of the phrase 'additional school facilities.' "

Nekoosha-Edwards Paper Co. v. Minneapolis, St. P. & S. S. M. Ry. Co., 217 Wis. 426, 259 N.W. 618, 620, held that a railroad was permitted to pay a rental for facilities owned by a shipper including the services of the switching crew; that the term "facilities" as used in the statute "included a switch engine and the service of a crew",

and that the meaning was not changed by an amendment which prohibited a railroad from paying an industry for performing any part of the service incident to the origination or determination of carload shipments which the railroads had assumed to perform under the provisions of the bill of lading. In Commonwealth ex rel. Hensel v. Sturtevant, 182 Pa. 323, 37 A. 916, a ferry franchise required the operator to "furnish needful facilities for ferrying" foot passengers over a river, and one of the allegations of violation was that "the employés in charge of the ferry are and have been inexperienced, incapable, and negligent".

In People ex rel. Schlaeger v. Bunge Bros. Coal Co., 392 Ill. 153, 64 N.E.2d 365, 370, the Supreme Court of Illinois stated: "The word 'facilities' is not a technical word but one in common use, and its meaning is to be found in the sense attached to it by approved usage. Standard lexicographers give 'aid,' 'assistance,' and 'help' as synonyms or equivalents of 'facility.' Thus books, maps, globes and charts are facilities to the imparting of knowledge. The meaning of the word is not, however, limited to inanimate bodies or things. A school with a complement of pupils in every room, but lacking teachers, would certainly not have facilities to carry on educational work. Without a crew to man his vessel, the captain of a ship would not have the necessary facilities to enable the ship to sail." To the same effect see 35 C.J.S. Facility, p. 488. Hartford Electric Light Co. v. Federal Power Commission, 2 Cir., 131 F.2d 953, 961, characterized the term as used in the Federal Power Act in this manner: "It should be noted that the word 'facilities' is generally regarded as a widely inclusive term, embracing anything which aids or makes easier the performance of the activities involved in the business of a person or corporation."

The plaintiff urges that the rule of ejusdem generis applies, citing Hammett

v. Kansas City, 351 Mo. 192, 173 S.W.2d 70, 75[8, 9], and that the general words must be restricted to the particular classes or things enumerated. The Hammett case recognizes, however, that the purpose of the doctrine or rule of ejusdem generis is to ascertain the intention of the lawmaker. Moreover, the rule is an aid to construction and not a positive rule of law and never overrides an intention that is clear. Obetz v. Boatmen's National Bank of St. Louis, 361 Mo. 221, 234 S.W.2d 618, 623[14]. See also State v. Smith, 233 Mo. 242, 135 S.W. 465, 468, 33 L.R.A., N.S., 179, and 50 Am.Jur., Statutes, § 250, p. 246. In Briggs Mfg. Co. v. United States, 2 Cir., 30 F.2d 962, 964, the court declined to apply the rule of ejusdem generis in construing a text that contained the term "facility". The rule does not appear to be preclusive or deteminative in the present situation.

Section 211.011 provides that the Juvenile Court Code, §§ 211.011 to 211.431, "shall be liberaly construed" to the end that the child "shall receive such care, guidance and control, * * * as will conduce to the child's welfare and the best interests of the state * * *." Section 211.031 among other things provides that the juvenile court shall have exclusive original jurisdiction in proceedings involving any child within the county "who is alleged to be in need of care and treatment" because the parents or others "neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his well-being" or because the "behavior, environment or associations of the child are injurious to his welfare or to the welfare of others". Section 211.171 provides that the juvenile court judge may take testimony and inquire into the habits, surroundings, conditions and tendencies of the child so as to enable the court to render such judgment or order as will best promote the welfare of the child and carry out the objectives of §§ 211.011 to 211.431.

Chapter 211 enacted in 1957 emphasizes the diagnosis and the care and treatment of disturbed and neglected children. It indicates an enlightened approach to present-day juvenile problems. Section 211.401 requires the juvenile officer to make investigations and reports and to perform other duties "under the direction of the juvenile court". It appears that the general assembly knew of the magnitude of the problems of administration in a place such as the City of St. Louis where there are more than 5,000 referrals a year and 70 to 80 employees to direct and supervise. Judge McMullan testified that before the position of administrative assistant was established juvenile officers were coming in to see him all the time and would line up outside his door. The juvenile judge could not be expected to handle this burden of administrative problems and also perform his other duties adequately. The general assembly could not foresee and spell out the means or facility best suited to the administration of the Act in each county or class of counties, but the statutes indicate a purpose to provide the courts and counties with ample authority to cope with local situations and to make the Act effective.

Subd. 3 of § 211.161 is concerned with providing "proper services for the court in the diagnosis and treatment of children"; to accomplish this purpose it authorizes the establishment of "medical, psychiatric and other facilities". This is consistent with the dominant thought of diagnosis, care and treatment that runs throughout the chapter. The office or position of administrative assistant is not alien to medical or psychiatric facilities. The court or some qualified person for him must determine in each case whether an examination should be given. Regardless of whether the decision is to examine or not, the determination must be made and is important. Furthermore, the function of the administrative assistant is germane to the entire statutory purpose of diagnosis, care and treatment.

Section 211.011 admonishes us that the Juvenile Code consisting of §§ 211.011 to 211.431 "shall be liberally construed" to the end that the children affected shall receive such care, guidance and control as will conduce to the welfare of the child and the best interests of the state. The evidence identifies and describes the function of the office of administrative assistant and tangible things such as manuals, programs and directives that will be developed and maintained to facilitate the work of the court and its staff. Webster's Third New International Dictionary gives this definition of "facility" among others: "5 a: something that promotes the ease of any action, operation, transaction, or course of conduct—usu. used in pl. (excellent *facilities* for graduate study)". This court has not previously passed on the question of whether such an office or position can properly be said to be a "facility". We are persuaded, however, by the cases cited from other jurisdictions and the mandate of a liberal construction of Chapter 211 that the word "facility" as used here is not limited in its meaning to inanimate objects but may include the services of a person or persons as well.

■ We hold and declare that the establishment of the office or position of administrative assistant in the Juvenile Division of the Circuit Court of the City of St. Louis is authorized by law in that it is within the meaning of the term "other facilities" as used in § 211.161, subd. 3. If the general assembly had intended the narrow construction for which the plaintiff contends, it could have accomplished its purpose by using more restricted terms in both sentences constituting subd. 3 of § 211.161, and we are not referriing solely to the words "other facilities". Moreover, it could have omitted or limited the statutory mandate to construe it liberally. The administrative assistant's function, to the extent that it renders the work of medical, psychiatric and psychological facilities more effective, is important; but under the broad grant of power his services need

not be limited to them. They may include the whole field of "proper services for the court in the diagnosis and treatment of children coming before it".

Furthermore, under § 211.161, subd. 3, the juvenile court is authorized to appoint the administrative assistant and to fix his salary. This statutory authority renders nugatory the contention that the expenditures are not authorized under the city charter. Other contentions made by the plaintiff are disposed of by our decision that the state law authorizes the establishment of the office of administrative assistant and the appointment of a person to fill the position and to fix his compensation. It is further unnecessary to consider other contentions made by the defendants.

The judgment is affirmed.

All concur except EAGER, J., who concurs in result, believing that § 211.351, RS Mo 1959, is sufficient to authorize the appointment.